507 F.2d 333
 James RHEM et al., Plaintiffs-Appellees,
v.
Benjamin J. MALCOLM, Commissioner of Correction for the City
of New York, et al., Defendants-Appellants, Peter
Preiser, Commissioner of Correction of
the State of New York, et al.,
Defendants.
 No. 329, Docket 74-2072.
 United States Court of Appeals, Second Circuit.
 Argued Sept. 25, 1974.
Decided Nov. 8, 1974.
 
 Stanley Buchsbaum, New York City (Adrian P. Burke, Corp. Counsel for City of New York, L. Kevin Sheridan, Leonard Bernikow, Kew Gardens, N.Y., Mark D. Lefkowitz, New York City, on the brief), for defendants-appellants.
 Joel Berger, New York City (William E. Hellerstein, Steven A. Herman, Eric Neisser, The Legal Aid Society Prisoners' Rights Project, New York City, on the brief), for plaintiffs-appellees.
 Before LUMBARD, FEINBERG and OAKES, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 In September 1970-- one month after an explosive riot at the Manhattan House of Detention for Men-- several inmates brought a civil rights action under 42 U.S.C. 1983 in the United States District Court for the Southern District of New York against various New York City and State officials. The complaint alleged that conditions in the House of Detention, better known as the Tombs, denied plaintiffs and the class they represent their 'fundamental constitutional rights.' In January 1974, after a trial which lasted several weeks, Judge Morris E. Lasker held that the circumstances under which unconvicted, pre-trial detainees were confined in that institution 'manifestly violate the Constitution.' The judge stated that 'the dismal conditions' at the Tombs 'would shock the conscience of any citizen who knew of them.' 371 F.Supp. 594, 636. In March 1974, the judge entered final judgment on certain issues not now relevant,[1] set a hearing date for further consideration of others,[2] and ordered the City defendants to submit a plan for the elimination of the remaining conditions which had been held unconstitutional. After some delay, the City[3] finally flatly refused to submit the required plan. Thereafter, the court, on July 11, 1974, enjoined the City from confining any person in the Tombs after August 10, 1974.
 
 
 2
 The City appealed from the July 11 order and sought a stay. In August, a panel of this court granted a conditional stay and expedited the appeal.[4] We heard argument on September 25, and the stay has continued in effect. Appellant attacks both the substance of the district court's findings and the relief granted. The City claims that conditions at the Tombs, while far from ideal, do not violate due process. Even if this is not true, the City argues, the order directing it to submit a plan was improper and the order closing the Tombs was unreasonable. For reasons set forth below, we affirm the judgment of the district court insofar as it held unconstitutional certain conditions at the Tombs but remand for further consideration of the court's order.
 
 
 3
 * In holding that the constitutional rights of unconvicted, pre-trial detainees had been violated, Judge Lasker wrote a thoroughly documented and persuasive opinion. 371 F.Supp. 594. The judge made detailed findings on excessive use of maximum security conditions; limitations on visiting rights; insufficient opportunities for exercise, recreation and education; the intolerable living environment created by the combination of excessive heat and noise, inadequate ventilation, and inability to see out of the building; and the failure to staff the jail adequately. There is no need to list the judge's findings in detail. They present a melancholy picture of a fortress in bedlam. In short, according to the judge,
 
 
 4
 The totality of circumstances at (the Tombs) have produced dismal conditions significantly inferior to those existing at New York State penal institutions and many other municipal or federal houses of detention.
 
 
 5
 371 F.Supp. at 622. The City does not argue that the judge's essential findings of fact are clearly erroneous. It could not do so with success in any event since the findings are solidly supported by the record.
 
 
 6
 The district judge went on to analyze the constitutional issues involved. As he viewed it, the core of plaintiffs' constitutional arguments is that they are not convicted felons but are pre-trial detainees, presumed innocent of the charges against them but imprisoned only for failure to make bail.[5] The judge accepted the following propositions as 'now firmly embedded in the law.' The demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail; and the same constitutional provisions prevent unjustifiable confinement of detainees under worse conditions than convicted prisoners. 371 F.Supp. at 623. We agree with these propositions and rely, as did the district judge, upon the considerable number of recent decisions applying them. Although there have been few direct appellate holdings on the subject, the many district court opinions cited by Judge Lasker are indeed persuasive. Thus, in Brenneman v. Madigan, 343 F.Supp. 128 (N.D.Cal.1972), the court held that:
 
 
 7
 Pre-trial detainees do not stand on the same footing as convicted inmates . . .. Subjecting pre-trial detainees to restrictions and privations other than those which inhere in their confinement itself or which are justified by compelling necessities of jail administration, is a violation of the due process and equal protection clauses of the Fourteenth Amendment.
 
 
 8
 Id. 343 F.Supp. at 142. In Jones v. Wittenberg, 323 F.Supp. 93, and 330 F.Supp. 707 (N.D.Ohio 1971), aff'd sub nom., Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972), the court put it this way:
 
 
 9
 . . . (detainees) are not to be subjected to any hardship except those absolutely requisite for the purpose of confinement only, and they retain all the rights of an ordinary citizen except the right to go and come as they please. (Otherwise) their confinement . . . denies them the equal protection of the laws.
 
 
 10
 323 F.Supp. at 100. Similarly, in Hamilton v. Love, 328 F.Supp. 1182 (E.D.Ark.1971), the court stated:
 
 
 11
 The distinction between those detained and those on bail must be based upon the State's determination that there is a need for physical custody of the former . . .. Accepting this distinction as constitutionally permissible, then it is manifestly obvious that the conditions of incarceration for detainees must, cumulatively, add up to the least restrictive means of achieving the purpose requiring and justifying the deprivation of liberty.
 
 
 12
 Id. at 1192. Some district courts have also found the cruel and unusual punishment prohibition of the eighth amendment directly applicable to detainees.[6] This court, however, has expressed 'considerable siderable doubt that the . . . clause is properly applicable at all until after conviction and sentence.' Johnson v. Glick, 481 F.2d 1028, 1032 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973). Accordingly, we prefer to adopt the approach taken by the district judge here that a detainee is entitled to protection from cruel and unusual punishment as a matter of due process and, where relevant, equal protection. 371 F.Supp. at 623-624 & n. 5. See also Inmates of Suffolk County Jail v. Eisenstadt, 360 F.Supp. 676, 688 (D.Mass.1973), aff'd, 494 F.2d 1196 (1st Cir.), cert. denied, U.S. , 95 S.Ct. 239, 42 L.Ed.2d 189 (1974).
 
 
 13
 Testing conditions in the Tombs against these standards, the judge held that the constitutional rights of detainees were violated in the following ways, among others. All detainees are kept in maximum security conditions and are locked in a cage-like cell 16 hours a day, as a result of appellant's failure to establish a classification system to winnow out the approximately 20 per cent for whom maximum security might be necessary. For the remaining portion of the day, detainees are relegated to enforced idleness on noisy, stifling tiers. Failure to provide for contact visits eliminates altogether any chance 'to shake hands with a friend, to kiss a wife, or to fondle a child,' and visiting rights generally are unnecessarily limited and far less than those accorded convicted felons, restrictions not shown to be justified by security considerations. The 50-minute per week opportunity for exercise is inadequate. Finally, the extremes of heat and noise, the poor ventilation, and the inability to see the sun in the sky 'in some instances threaten, and in all cases unnecessarily burden the health' of the detainees. Id. 371 F.Supp. at 627.
 
 
 14
 On this phase of the case, appellant offers a number of arguments-- none very persuasive. The City first contends that while conditions at the Tombs may be 'very uncomfortable,' they do not deny due process. Thus, the City first tries to distinguish a number of the cases relied on by the district judge. It is true that in some, conditions were worse in many respects-- though not in all-- than those in the Tombs. E.g., Inmates of Suffolk County Jail v. Eisenstadt, supra; Brenneman v. Madigan, supra; Hamilton v. Love, supra (defendants stipulated conditions violated Constitution); Jones v. Wittenberg, supra. But this proves only that some jails are even less tolerable than the Tombs, not that the district judge here was necessarily in error. Arguing that conditions at the Tombs are not 'shocking to the conscience,' the City also attacks Judge Lasker's conclusion that maximum security confinement constituted cruel punishment 'at least for those in whose cases maximum security is not required.' 371 F.Supp. at 624 n. 5. However, because the rights of detainees rather than of convicted defendants are involved, the district judge did not have to decide whether conditions at the Tombs were so bad as to be 'cruel and unusual punishment' even for convicted felons. It is enough if the concededly 'very uncomfortable' conditions for detainees are so unnecessary as to be a denial of due process or compare so unfavorably with those accorded by the state to convicted defendants elsewhere as to deny equal protection of the laws. For it must always be remembered that detainees are not, as yet, guilty of anything.
 
 
 15
 The City next turns to some of the specific facts found by the court below. As to the heat, lack of ventilation and noise, appellant's principal argument seems to be that other New York City residents also experience similar unpleasant and unhealthy conditions. We assume that the argument is made in good faith, although it is difficult to take it seriously. Whatever may be the temporary inconvenience for New York City employees or residents in summer heat or winter cold, in office, apartment or subway, the evidence clearly shows that extremes are worse in the Tombs or of longer duration. Moreover, these hardships are imposed by the City in the exercise of its powers of custody over inmates. Next, appellant justifies the failure to provide contact visits for detainees by pointing to the dangers to prison security. While this concern is an important one, Judge Lasker found that federal detainees, held a few blocks away, are permitted such visits as are detainees in other cities, such as Philadelphia. The judge held that the evidence before him established that the 'risk caused by contact visits will be marginal and controllable,' a finding not clearly erroneous, and that such visits, including liberalized visiting days and hours were required 'at least for all detainees who, by classification, are shown not to require maximum security custody.' 371 F.Supp. at 626.
 
 
 16
 The reference to classification underlines one of the key issues on appeal. If it is possible to identify those detainees who are potentially violent or are likely to try to escape, it is quite clear that the constitutional rights of the much larger group of non-dangerous inmates are violated by the maximum security conditions of the Tombs. The judge found as a fact that it was 'feasible' for the City to classify inmates although it had not done so. 371 F.Supp. at 620. The City's principal claim to us is that a classification system would have to be based upon interviews with inmates, which would necessarily require them to incriminate themselves in violation of the fifth amendment. The argument is specious. while the questionnaire drawn up by an expert retained by the City might have been properly criticized on this ground, other approaches now used in comparable institutions are obviously available. The frivolity of appellant's argument is shown by its citation of a Report of the City Board of Correction[7] to attack this expert's proposed classification system, while ignoring the immediately preceding statement in the Report that:
 
 
 17
 We believe that it is incumbent upon the Department of Correction to introduce as quickly as possible at the Tombs . . . a classification system, which can determine to the best extent possible the degree of security required for individual inmates.[8]
 
 
 18
 Finally, the City argues that appellees, 'in describing the conditions at the Tombs which existed at trial, often fail to note the various changes that have since been implemented.'[9] Strictly speaking, the point is irrelevant since the judge's findings of fact and conclusions of law should ordinarily be considered on the basis of the record at trial. However, in his memorandum opinion of July 1974, accompanying the order under attack, the judge recognized that during the preceding six months 'some improvements have been made in the conditions' that were the basis of his January 1974 findings,[10] but concluded that, 'nevertheless, . . . the bulk of those conditions remain as they were.' Significantly, a few weeks later the City Board of Correction, in the Report already referred to, recommended closing the Tombs for redesign and renovation because of the 'fundamentally inhuman environment.'[11]
 
 
 19
 In short, after a review of the record and the applicable law, there is no doubt at all in our minds that Judge Lasker's findings of fact and conclusions of law in his detailed opinion in January 1974 must be affirmed.[12] We turn now to the propriety of his order devising equitable relief.
 
 II
 
 20
 In March 1974, following a series of conferences and written submissions by both parties, the district court entered a judgment based upon its January opinion. For purposes of this appeal, the key provision of the order required the City to submit within 30 days
 
 
 21
 a comprehensive and detailed plan for the elimination of all conditions and practices declared to be in violation of the Constitution of the United States by the Court's opinion of January 7, 1974, as to which final judgment has not been entered herein.
 
 
 22
 After filing various submissions which the district court found unresponsive, the City finally refused to submit the required plan. Stating that it 'cannot accept the City's blank refusal to comply with major portions' of its order, the district court on July 11, 1974, enjoined the City from further confining anyone in the Tombs after August 10, 1974. The judge made clear, however, that the order would be reconsidered if the City submitted a plan.
 
 
 23
 Appellant attacks this order on a number of grounds. First, the City claims that it was afforded too little time in which to make the required submission. It is true that the March 1974 order gave appellant only 30 days to come up with 'a comprehensive and detailed plan,' perhaps too short a period for prudent consideration of all the alternatives. As appellant points out, these included alteration of the Tombs, construction of a new jailhouse, or the use of facilities at Rikers Island. But whatever the stringency of the March order, the judge did not order the Tombs closed until July, and even then postponed the order's effective date to August 10, and indicated that he would reconsider this action if the City made a good faith effort to comply. At that time, it must be emphasized, the lawsuit had been pending for almost four years, and the judge's decision holding conditions at the Tombs unconstitutional had been issued six months before. If the handwriting was not yet clearly on the wall, it was at least more than barely legible to an interested reader. The City's claim that overall it did not have enough time to submit its plan is not persuasive.
 
 
 24
 Appellant also argues that the March order 'constituted an unnecessary and excessive intrusion by the Court into the details of government.' Instead of getting involved in 'all sorts of matters that belong within the jurisdiction of the executive and legislative arms of government,' according to appellant, the district court 'could have directed that conditions be remedied by a reasonable date.'[13] Citing Inmates of Suffolk County Jail v. Eisenstadt, supra, the City claims that the court there 'made no such attempt to control how the defendants remedied the unconstitutional conditions,'[14] and instead merely ordered that no one be confined in the institution after three years from the date of the opinion. The City's limited description of what the court did in Inmates of Suffolk County Jail is incorrect, see 360 F.Supp. at 690-693, and its citation of the case with apparent approval is odd. Judge Lasker did finally choose the course appellant says he should have followed in the first place. The July 11 order from which the City appeals directed the closing of the Tombs by August 10. Arguably, that provision standing alone might have allowed too short a grace period. But given the background of a thorough opinion in January, which could be ignored only at peril, we would not be prepared to call the August 10 deadline an abuse of discretion had the district judge fixed it in January. Therefore, appellant is in the curious position of claiming that the district judge was too flexible, and erred because he refused at first to utilize his powers to the fullest and forbid use of the Tombs to house detainees after a specified date in the future. But since the district judge did not at first go that far-- indeed, he clearly did not want to take such drastic action-- we should meet appellant's argument head-on.
 
 
 25
 Even a brief review of recent decisions dealing with prison conditions makes clear that, contrary to the City's assertion, there are many cases in which extensive changes in prison practices have been required by the federal courts. Local officials have been ordered to do everything from hiring dozens of guards and other workers[15] and building new, or substantially altering old, facilities,[16] to appointing a prison ombudsman and creating a Department of Detention and Correction.[17] Nevertheless, this case is unusual because the remedy for constitutional violations requires such substantial physical changes in a jail located in the heart of a large metropolitan area. Under these circumstances, and with the City pleading 'fiscal inability to commit itself to a comprehensive plan to restructure the institution,'[18] we believe that the order should be framed to close the prison to detainees or to limit its use for detainees to certain narrow functions by a fixed date, unless specified standards are met. Cf. Inmates of Suffolk County Jail, supra. Once the appropriate standards or permissible limited uses are established, the court can then determine whether there has been compliance by the specified deadline. If the City fails to satisfy these criteria in time, the district judge, in his discretion, may postpone the effective date of any order, but he should do so only if clear and convincing proof of adequate planning and funding of improvements is produced. True, the ultimate effect of such a remedial scheme may not differ much from that used by Judge Lasker. It has the crucial practical advantage, however, of not putting the judge in the difficult position of trying to enforce a direct order to the City to raise and allocate large sums of money,[19] see Procunier v. Martinez, 416 U.S. 396, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), steps traditionally left to appropriate executive and legislative bodies responsible to the voters.[20]
 
 
 26
 For these reasons, we are remanding this proceeding to the district judge to refashion the equitable relief. For example, he might require that no person awaiting trial be detained in the Tombs after a date certain unless conditions are upgraded to meet specific criteria, as outlined in his January opinion. Similarly, use of the Tombs might be limited to certain purposes, such as initial confinement for a fairly short period, or the overnight housing of detainees scheduled to appear in court or to consult with their attorneys the following day. In this second case, it might also be necessary to establish minimum standards as a prerequisite even for limited use. Finally, the judge will also have the option of ordering that no detainees be housed in the Tombs after a reasonable date if he feels certain that the City cannot-- or will not-- remedy constitutional deprivations. The choice of remedy, however, has tremendous implications not only for the City but also for pre-trial detainees who may find themselves dispersed to facilities far away from family, friends and attorneys. Therefore, the parties should have a further opportunity promptly to offer suggestions for such an order. However, the district judge should not allow another trial on the merits of plaintiffs' claim or countenance any significant delay in fashioning another decree. Four years after ugly riots caused by conditions at the Tombs, the time has come to end this litigation.
 
 
 27
 Before closing this opinion, a further word may be appropriate. One does not get the impression from the record of defendants straining in every way to comply with the district court's directions. The foot dragging is, of course, understandable. The financial woes of the City of New York are obvious to all who live or work here, including federal judges. And on the agenda of City priorities, which includes supply of such essential services as police and fire protection, provision of welfare, care of the ill, collection of garbage, and maintenance of the transit system, it is not surprising that the housing of those confined in jail is not at the top of the list. But pre-trial detainees are people, not outcasts, who are presumed to be innocent of any crime and who have rights guaranteed by the Constitution, as do we all. When a district court is presented with a claim of violation of those rights, its proper function is to decide the case before it, whatever sympathy it may have for those who must manage a great metropolis beset by grievous problems. Nor can similar considerations deflect us from the issues on appeal. Over two hundred years ago, Blackstone elegantly stated that pre-trial commitment for those unable to make bail
 
 
 28
 is only for safe custody, and not for punishment: therefore, in this dubious interval between the commitment and the trial, a prisoner ought to be used with the utmost humanity, and neither be loaded with needless fetters or subjected to other hardships than such as are absolutely requisite for the purpose of confinement only . . ..
 
 
 29
 4 Blackstone, Commentaries 300. No undue sensitivity is required to perceive from this record that pre-trial detainees at the Tombs are 'used' with less than 'the utmost humanity.' It may not be simple to fashion a remedy that will remove the 'needless fetters' and unnecessary 'hardships,' threatening the spirit, health and sanity of detainees during the 'dubious interval' they are confined in the Tombs. But such conditions cannot be condoned by continued inaction.
 
 
 30
 We affirm the order appealed from insofar as it is based upon findings of fact and conclusions of law that various conditions at the Tombs are unconstitutional. We remand the case to the district court for further consideration, in light of this opinion, of the relief to be granted.[21]
 
 
 
 [1]
 The court enjoined defendants from interfering with plaintiffs' rights to receive mail from courts and attorneys or printed reading material from any source, and from revoking visitation and correspondence rights as a punishment for institutional infractions. Hearing requirements were established for imposition of disciplinary punishment. The City and State defendants appealed the disciplinary hearing portion of the order. On July 16, 1974, this court remanded for reconsideration in light of Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)
 
 
 [2]
 This hearing, which was held in March 1974, concerned the visiting program
 
 
 [3]
 The City defendants now are Benjamin J. Malcolm, Commissioner of Correction; Peter Schaefer, Warden, Manhattan House of Detention for Men; and Mayor Abraham D. Beame. For convenience, we refer to them collectively as 'the City' or 'appellant.'
 
 
 [4]
 The stay was on condition that the City honor inmate requests for transfers to the New York City House of Detention for Men at Rikers Island or to other available facilities made by prisoners who had already been at the Tombs 40 days or who, after the order, were held more than 14 days. Excepted were inmates currently on trial, those denominated escape risks, and those held for mental observation who were scheduled to be moved within six weeks to a new, specially equipped facility. District Judge Frankel, sitting by designation, dissented as to the time limits and the exceptions for the latter two groups of inmates
 
 
 [5]
 Plaintiff class was defined shortly after the action was commenced as including 'all the inmates of the Tombs,' see Rhem v. McGrath, 326 F.Supp. 681, 682 (S.D.N.Y.1971), but we note that the prison is used to house a comparatively small group of convicted misdemeanants as well as pre-trial detainees, see 371 F.Supp. at 599. We have focused our opinion, as did Judge Lasker, only on the rights of the detainees. The constitutional theory applicable to convicted prisoners is sufficiently different from that discussed here to justify not regarding them as part of the plaintiff class for purposes of this appeal
 
 
 [6]
 See, e.g., Johnson v. Lark, 365 F.Supp. 289, 301-303 (E.D.Mo.1973); Collins v. Schoonfield, 344 F.Supp. 257, 264-265 (D.Md.1972), and 363 F.Supp. 1152 (D.Md.1973); Jones v. Wittenberg, supra, 323 F.Supp. at 99-100. See also, Note, Constitutional Limitations on the Conditions of Pretrial Detention, 79 Yale L.J. 941, 951-953 (1970)
 
 
 [7]
 New York City Board of Correction, Report on the Future of the Manhattan House of Detention (Aug. 6, 1974)
 
 
 [8]
 Id. at 29
 
 
 [9]
 Appellant's Reply Brief at 2
 
 
 [10]
 For example, the inmate population of the Tombs was approximately 1,300 at the start of the trial, but by July 11, 1974, it had fallen to 522
 
 
 [11]
 Op. cit., note 7 supra, at 27
 
 
 [12]
 We note that we do not deal in this opinion with the findings and conclusions underlying the judgment referred to in note 1 supra and accompanying text
 
 
 [13]
 Appellant's brief at 38, 40
 
 
 [14]
 Id. at 40
 
 
 [15]
 Hamilton v. Landrieu, 351 F.Supp. 549 (E.D.La.1972) (this order contains 53 separate substantive items), see also 338 F.Supp. 1016 (E.D.La.1970); Hamilton v. Love, supra, 328 F.Supp. at 1195-1196, see also 358 F.Supp. 338 and 361 F.Supp. 1235 (E.D.Ark.1973); Holt v. Sarver, 309 F.Supp. 362, 373-376, 383-385 (E.D.Ark.1970), aff'd, 442 F.2d 304 (8th Cir. 1971) (replacement of trusty guards with 'free world' personnel in Arkansas penal system), see also 300 F.Supp. 825 (E.D.Ark.1969) and 363 F.Supp. 194 (E.D.Ark.1973); Taylor v. Sterrett, 344 F.Supp. 411, 422 (N.D.Tex.1972), aff'd in part, rev'd in part, 499 F.2d 367 (5th Cir. 1974)
 
 
 [16]
 Taylor v. Sterrett, supra (renovate cells for several hundred prisoners and provide facilities for recreational, religious and educational programs); Holt v. Sarver, supra (under prodding from court, state legislature appropriated money for new buildings and improvements); Hamilton v. Landrieu, supra (new infirmary ordered constructed immediately); Jones v. Wittenberg, supra, 330 F.Supp. at 720-721 (extensive repairs and remodelling ordered)
 
 
 [17]
 Hamilton v. Landrieu, supra
 
 
 [18]
 Appellant's brief at 6
 
 
 [19]
 Since prohibiting use of the Tombs to incarcerate detainees is a viable alternative, we do not have a situation where the unconstitutionally-administered governmental function must be kept operating in any event. In such a case, a court might have no choice but to order an expensive, burdensome or administratively inconvenient remedy. See, e.g., Swann v. Board of Educ., 402 U.S. 1, 28-30, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); Goss v. Board of Educ., 482 F.2d 1044, 1046 (6th Cir. 1973) (en banc), cert. denied, 414 U.S. 1171, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974); Medley v. School Board, 482 F.2d 1061, 1065 (4th Cir. 1973) (en banc), cert. denied, 414 U.S. 1172, 94 S.Ct. 933, 39 L.Ed.2d 120 (1974)
 
 
 [20]
 As the court said in Hamilton v. Love, supra, 328 F.Supp. at 1194:
 Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights. If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons. The final decision may, indeed, rest with the qualified voters of the governmental unit involved. This Court, of course, cannot require the voters to make available the resources needed by public officials to meet constitutional standards, but it can and must require the release of persons held under conditions which violate their constitutional rights, at least where the correction of such conditions is not brought about within a reasonable time.
 A similar sentiment was expressed in Jones v. Wittenberg, supra, 330 F.Supp. at 712-713:
 In order to build a new jail, the public must provide additional funds. This Court has no power whatsoever to require the public to do so. Under our system of government, the ultimate source of power is the people. The people have not given this Court any taxing power, or any control over their use of the taxing power . . .. This Court will not attempt to exercise a power that it does not and should not have. There are strong reasons for thinking that a new jail should be built, and that in the long run substantial economies both in money and in lives could be effected by doing so. However, until a majority of the voters of Lucas County become convinced of this, there will be no new county jail.
 
 
 [21]
 The terms of the August order of this court permitting detainees held more than 14 days in the Tombs to request transfers to other institutions, see note 4 supra, will remain in effect until Judge Lasker, in his discretion, enters a further appropriate order