**HOSPITAL ASSOCIATION OF NEW YORK STATE, INC., et al., Plaintiffs,**

**v.**

**Philip L. TOIA, as Commissioner of Social Services of the State of New York, et al., Defendants.**

**No. 76 Civ. 2027.**

United States District Court, S. D. New York.

Feb. 10, 1977.

Proskauer, Rose, Goetz & Mendelsohn, New York City, for plaintiffs; Jacob Imberman, Robert M. Kaufman, Susan Rosenfeld, M. William Scherer, Gail G. Sticker, New York City, of counsel.

Rosenman, Colin, Freund, Lewis & Cohen, New York City, for the New York City Health and Hospitals Corp.; Peter F. Nadel, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, for State defendants; Covington & Burling, Washington, D. C., of counsel.

Robert B. Fiske, Jr., U. S. Atty., S. D. N. Y., New York City, for U. S. Dept. of Health, Education & Welfare; John M. O'Conner, Asst. U. S. Atty., New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

By judgment and order of August 2, 1976, the defendants were enjoined from applying three regulations (10 N.Y.C.R.R. §§ 86.14(b); 82.21(k) and 82.26) to determine the reimbursement rates for inpatient care afforded Medicaid patients by the plaintiffs before they were approved by the Secretary of HEW, and were further enjoined from applying any regulation effecting a change in the state plan providing for such reimbursement without obtaining prior HEW approval of the amendment to the state plan. The state defendants were directed to "promptly recompute and pay reimbursement rates for inpatient medical services rendered on and after January 1, 1976 in accordance with the approved New York State plan . . . ." Defendants appealed from this judgment, and the Court

of Appeals remanded for our determination of whether HEW approval of the challenged regulations (which occurred on August 16, 1976) was retroactive. On November 9, we found that HEW approval was not retroactive, and again directed the defendants to comply with the terms of the August 2nd order. The defendants did not move for a stay of judgment until November 19th; their motion was denied on November 22nd. On December 14th, the Court of Appeals also denied the defendants' application for a stay of judgment. Plaintiffs thereupon moved, by order to show cause, to hold the state defendants in contempt for wilfully and deliberately disobeying the court's order of August 2nd, by failing to recalculate and pay reimbursement rates owed the plaintiffs from January 1st to August 16, 1976. Upon the state's representation on December 17th that recalculation in accordance with the previous order would proceed forthwith, no action was taken on the motion for contempt.

By letter and accompanying affidavit of January 13, 1977, the Health and Hospitals Corporation (HHC) sought to renew the application to hold the defendants in contempt. HHC, which is a member of the plaintiffs' class but which is also appearing separately for purposes of litigating issues relating only to HHC, claims that although the state has now recalculated its rates for HHC it has done so in disobedience of the court's order that the recalculation be in accordance with the 1975 approved New York State Plan. It specifies three violations:

"(a) No longer would HHC's hospital system receive a single composite reimbursement rate, but rather individual rates for the 17 facilities would be established;

(b) for the first time, ceilings based on the costs of groups of voluntary hospitals would be applied to HHC's individual facilities; and

(c) in computing the ceilings applicable to HHC facilities, the costs of the HHC hospitals would be excluded from the computation of the ceilings made applicable to these hospitals."

(Affidavit of Peter Nadel, in support of HHC's application to renew motion to hold state defendants in contempt, ¶ 10.) In all three respects, HHC claims that the methodology employed was not authorized by the 1975 New York State approved plan; that the changes were in fact the subject of a fourth new regulation, § 86.14(e), which was also approved by HEW on August 16th; and that the new regulation is itself proof that the changes were not authorized by the previous state plan.

The defendants' answer that they believe in good faith that the computations made are in accordance with the 1975 plan and any changes made in reimbursement methodology for the January 1—August 16, 1976 period were authorized by the 1975 plan; that HHC has been treated more leniently than is authorized under the earlier plan; and, quite unpersuasively, that the purpose of the amendment is simply to require HHC's rates to be computed in a manner already permitted under the 1975 Approved plan.

■ Before reaching the merits, one procedural issue requires attention, although not briefed by either of the parties. Rather than making a separate motion for contempt, HHC has denoted its present application as a renewal of the contempt motion previously filed on behalf of the entire plaintiff class. That motion was clearly intended as a motion to hold the state defendants in *criminal* contempt. The state defendants were accused of a "willful failure and refusal to obey the . . . Judgments and Orders of this Court;" the defendants were directed to show cause why they "should not be punished for engaging in such contemptuous behavior." (Order to Show Cause; signed December 15, 1976.) See *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911). But there is no basis for finding the state defendants in criminal contempt of court on the facts alleged in HHC's present moving affidavit. The regulation in question, § 86.14(e), was not before this court on any of the earlier motions or judgments. See Order to Show Cause

and Amended Complaint each dated July 16, 1976; Judgment and Order dated July 30th and entered August 2, 1976; Judgment filed October 15th and entered October 29, 1976; Memorandum Opinion filed November 9, 1976. Indeed, the first mention of § 86.14(e) was not made until the Second Amended Complaint was filed on September 29, 1976; and HHC did not appear separately in this action until November 15, 1976, long after the underlying judgment, which it is claimed the defendants have violated, was entered. Since whether the three changes in methodology are violations of that order is not readily apparent, a determination of criminal contempt would be inappropriate particularly where the conduct complained of had never been the subject of a decision on the merits.

We proceed to determine whether a civil contempt has been committed.

The defendants do agree that the August 2nd order was not limited by its terms to the three regulations which it specifically mentioned, but rather, prohibited the state from employing *any* change in the state plan governing reimbursements for inpatient care without obtaining prior HEW approval of the change. Specifically, they agree that by the terms of the earlier order, regulation § 86.14(e) may not be validly applied to the period prior to approval by HEW on August 16, 1976. Their position on this motion is that the changes in methodology, which they concede were employed, were authorized by the approved state plan in existence in 1975.

■ Accordingly, we treat HHC's application as a motion to hold the state defendants in *civil* contempt for failing to comply with the Judgment and Order of August 2, 1976. On a civil contempt motion, the fundamental question is whether the conduct complained of was in fact prohibited (or required) by the court's decree; no finding of wilfulness or wrongful intent is necessary:

"The absence of wilfulness does not relieve from civil contempt. Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damages sustained by reason of noncompliance. . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act. The decree was not fashioned so as to grant or withhold its benefits dependent on the state of mind of respondents. It laid on them a duty to obey . . . An act does not cease to be a violation of a law and of a decree merely because it may have been done innocently. The force and vitality of judicial decrees derive from more robust sanctions." *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949).

For the reasons set forth below, we find the defendants to have violated the previous orders with respect to two of the three changes in methodology. In reaching this conclusion, however, we have had no reason to question the defendants' good faith belief in the propriety of their actions.

### I. Composite v. Individual Rates for HHC Members

■ Plaintiff argues that the language of N.Y.C.R.R. § 86.14(e) (approved August 16, 1976)[1] indicates that individual treatment of HHC members was not previously permitted. On its face § 86.14(e) does not support its view. It provides that

"Hospitals operated by the Health and Hospitals Corporation will be identified with respect to type and size with the appropriate group of voluntary facilities developed in accordance with Section 86.13 and any ceilings established for the voluntary group of facilities will be applied to such hospitals." (10 N.Y.C.R.R. § 86–1.14(e))

Not only is this regulation silent on the question of whether composite or individual rates are required, but it is an amendment to a section in the state plan dealing not with *rates* but with ceilings. Similarly, Section 86.13 (referred to in Section 86.14(e) above) sets forth criteria to be used for grouping hospitals for purposes of determining ceilings (not rates).

1. This has been recodified in the published rules as 86–1.14(e).

It is true that in 1975 rates were set for HHC on a composite basis, whereas in recalculating the rates for the first part of 1976, individual rates for member hospitals were utilized. Plaintiff argues that so substantial a change in reimbursement methodology requires advance HEW approval. The purposes behind the statutory requirement of advance approval appear to be two-fold: (1) to protect the public interest in assuring that hospitals providing medicaid services are reimbursed for their reasonable costs, and (2) to protect that pecuniary interest of HEW as a financial cosponsor of reimbursement for medicaid services. In light of these purposes, if a particular methodology were authorized in an approved state plan, but the state used another, no further HEW approval would be required to permit the state to employ the methodology previously authorized. The question is not whether there was a change in methodology employed (as defendants concede there was) but rather, whether the new methodology employed in calculating HHC's reimbursement rate for the period January 1st to August 16, 1976 had previously been authorized.

We find that it was so authorized. Section 86.1 of the plan defined a "medical facility" to include all facilities covered by the term "hospital" or "Home health agencies" as defined in Article 28 of the Public Health Law. Section 2801 of the Public Health Law of New York appears to define these terms to mean a single hospital unit, or single complex rather than a corporate

group.[2] Thus, Section 86.11 of the approved plan, which required that basic reimbursement rates be computed "on the basis of allowable fiscal and statistical data submitted by the medical facility . . appeared to contemplate that reimbment rates normally be determined on hospital by hospital basis, even for the 17 member hospitals of HHC. Whether or not it was permissible for the state in 1975 to compute HHC's reimbursement rate on a composite basis is not in issue;[3] the issue is whether the 1975 plan authorized rates for HHC's member hospitals to be computed individually, on a hospital by hospital basis. We find that it did.

Accordingly, HHC's motion to hold the state in contempt for failing to compute a composite rate for HHC is denied.

## II. Application of Voluntary Hospital Ceilings to HHC Members

The 1975 approved New York State Plan required that for purposes of establishing ceilings, medical facilities "shall be grouped as follows . . . (5) Sponsor. (i) Voluntary (ii) Public (iii) Proprietary." 10 N.Y.C.R.R. § 86.13. The language of this regulation on its face defeats defendants' contention that sponsorship is simply one factor which the state *may* consider. The language of the regulation is mandatory and therefore also defeats the state's argument that for purposes of establishing ceilings sponsorship is a relevant distinguishing characteristic only between non-profit (i. e. voluntary and public) and pro-

2. Section 2801 of Article 28 of the New York Public Health Law provides, in relevant part, that:

"'Hospitals' means a facility or institution engaged principally in providing services by or under the supervision of a physician or, in the case of a dental clinic or dental dispensary, of a dentist, for the prevention, diagnosis or treatment of human disease, pain, injury, deformity or physical condition including, but not limited to, a general hospital, public health center, diagnostic center, treatment center, dental clinic, dental dispensary, rehabilitation center other than a facility used solely for vocational rehabilitation, nursing home, tuberculosis hospital, chronic disease hospital, maternity hospital lying-in-asylum,

out-patient department, dispensary and a laboratory or central service facility serving one or more such institutions, but the term hospital shall not include an institution, sanitarium or other facility engaged principally in providing services for the prevention, diagnosis or treatment of mental disability and which is subject to the powers of visitation, examination, inspection and investigation of the department of mental hygiene except for those distinct parts of such a facility which provide hospital service."

3. Our research fails to disclose any regulation in the state plan requiring renewed approval for changes in methodology from a "deviation" back to the approved plan.

prietary hospitals. That may or may not be true in fact, but it is not what the regulation says.

This construction of the plan as set forth in 10 N.Y.C.R.R. § 86.13(a)(5), is supported by a recent New York State court Appellate Division decision construing the same regulations in an analogous situation. In *Broadacres Skilled Nursing Facility v. Ingraham,* 51 A.D.2d 243, 381 N.Y.S.2d 131 (1976), the Third Department held this regulation to require that for purposes of determining ceilings on reimbursements, the Commissioner must group nursing home facilities according to whether they are publicly sponsored except where, as provided in § 86.13(b), "one group contains an insufficient number of medical facilities needed to establish a reimbursable ceiling," in which case "such institutions shall be considered as part of another comparable group." The defendants in *Broadacres* argued that grouping of a public nursing home with voluntary nursing homes was justified under this exception, due to "great disparities in accounting procedures used by public homes in reporting their costs." A similar argument is advanced by the state defendants here in support of their grouping of HHC hospitals with voluntary hospitals. The Third Department resoundingly rejected the position, holding that the only exception to the requirement that medical facilities be grouped according (in part) to their public sponsorship is where the number of facilities in a relevant group is statistically inadequate. No such claim is made here, and there is no indication that it can be. Moreover, plaintiff's argument, that if imposition of voluntary hospital ceilings on HHC had been authorized by the previous state plan on the grounds set forth by defendants, no new regulation would have been necessary, has substantial force on this leg of the motion.

Whatever may be the merits of Section 86.14(e) (an issue to be decided at trial) it is the only authority for imposition of voluntary hospital ceilings on HHC hospitals under the circumstances set forth in the affidavits on this motion. Since § 86.14(e) was not approved by HEW until August 16th, it is a violation of our order of August 2nd for the state to apply ceilings of voluntary hospitals to the computation of HHC's rates for the period January 1st to August 16, 1976.

### III. Exclusion of HHC Costs From HHC Ceilings

The state not only grouped HHC with the voluntaries for purposes of determining the ceilings, but did so without averaging any of HHC's costs into such ceilings. The defendants have offered no source of authority in the approved plan for their having taken this action. They argue, rather, that omission of HHC costs in computing the ceiling represents a necessary and reasonable deviation from the plan "consistent with its authority to apply Part 86 in a practical and meaningful fashion" analogous to its previous "waiver" of the requirement of establishing individual rates for HHC members. (McCann Affidavit, p 2.) No statute, case or regulation is cited in support of this proposition, and it appears that Section 86.14(e) is the only arguable source of authority for this change in methodology. For reasons set forth in II above, we find that the defendants have violated the order of August 2nd by omitting HHC's costs in computing the ceiling applied to it.

Although the defendants have been found in contempt of the August 2nd order, counsel's representations that the state will promptly comply with the orders and directions of this court make it appropriate to suspend imposition of any sanctions to secure compliance. There should be no hesitation to use the power of the court even against state officials, where necessary to effectuate orders of the court, but the present situation does not warrant its use. Further noncompliance, of course, would be regarded in a different light. See *O. Fiss, Injunctions* at 764.

Accordingly, the state defendants are directed promptly to recalculate the reimbursement rates for HHC hospitals from January 1st to August 16th in accordance with this opinion and all prior orders of the court.

It is so ordered.