**NEW YORK STATE ASSOCIATION FOR RETARDED CHILDREN, INC. et al., and Patricia Parisi et al., Plaintiffs,**

v.

**Hugh L. CAREY et al., Defendants.**

Nos. 72 Civ. 356, 357.

United States District Court, E. D. New York.

April 10, 1980.

New York Civil Liberties Union, Mental Health Law Project, New York City, Christopher A. Hansen, Robert Levy, New York City, of counsel, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, Jonathan D. Siegfried, Helen Hershkoff, New York City, of counsel, for plaintiffs.

LeBoeuf, Lamb, Leiby & MacRae, New York City, Taylor R. Briggs, Richard C. Cole, William B. Griffin, New York City, of counsel, Robert S. Abrams, Atty. Gen. of the State of New York, New York City, Robert S. Hammer, Asst. Atty. Gen., New York City, of counsel, for defendants.

BARTELS, District Judge.

## MEMORANDUM DECISION and ORDER

Plaintiffs move by order to show cause dated April 2, 1980 for an order requiring defendants to pay all costs and expenses of the Willowbrook Review Panel or, in the alternative, for an order holding defendants

in contempt for failing to pay such costs and expenses. They also move to join the Comptroller of New York State, Edward V. Regan, as a defendant herein for the limited purpose of ensuring that all necessary parties are before the Court in the event that defendants are ordered to pay the costs and expenses of the Review Panel.

This application arises out of the deletion by the New York State Legislature from the state's Executive Budget all of the funds ($342,300.00) requested by the Governor for the salaries and expenditures of the Willowbrook Review Panel. Since this deletion occurred on or about March 31, 1980, New York State Office of Mental Retardation and Developmental Disabilities Commissioner James Introne has requested the Director of the Division of the Budget to make every effort to have the funds restored by the Legislature or, in the alternative, to find other means of funding the Panel. Until appropriation of such funding is assured, however, Comptroller Regan has refused to authorize payments to the Panel and its staff for work performed after March 31, 1980.

## I. *Consent Judgment*

The underlying civil rights action was instituted in 1972 under 42 U.S.C. § 1983 on behalf of a class of mentally retarded residents of Willowbrook Developmental Center (now Staten Island Developmental Center), alleging severely overcrowded and unsanitary conditions at the Center, significant shortages of sufficiently trained staff, and inadequate or non-existent medical and educational programs necessary to foster the habilitation and educational development of Willowbrook residents. On April 10, 1973, Judge Judd found that members of the Willowbrook class have a constitutional right to protection from harm, and on April 30, 1975, he approved and signed a Consent Judgment and Order agreed to by the defendants in this action. As an essential part of this Judgment and to insure proper implementation of its provisions, the Willowbrook Review Panel was established as the principal arm of the Court charged with the responsibility for monitoring compliance by the defendants with the provisions of the Judgment and making recommendations to the Court and the parties of steps deemed necessary to implement the Judgment. The precise composition, duties, jurisdiction, and authorization for compensation of the Review Panel and its staff are set forth in detail in paragraphs seven and eight of the Judgment, which need not be recited in full here. It is enough to note the interpretation of the Panel's authority by the Second Circuit Court of Appeals in *New York State Association for Retarded Children, Inc. v. Carey, et al.,* 596 F.2d 27, *cert. denied,* 444 U.S. 836, 100 S.Ct. 70, 62 L.Ed.2d 46 (1979):

> The authority [of the Review Panel] to make recommendations appears to us to be a well-constructed mechanism for flexible yet orderly and effective implementation and dispute resolution . . .
> We believe that the Consent Judgment authorized the Review Panel's recommendation as an exercise of the prospective, independent, and creative powers that the judgment accorded to the Review Panel. * * *
> In short, we treat the organizational structure established under the Consent Judgment—a Review Panel with the power to recommend interpretations of the Judgment and methods of implementing it—as analogous to the powers granted, say, to Congress under Section 5 of the Fourteenth Amendment to effectuate the matters of substance and procedure contained in the first four sections of that amendment.

In defining so expansively the responsibilities of the Panel—an interpretation with which this Court is in complete agreement—the Court of Appeals referred to the "self-executing mechanism for flexibility built into the Consent Judgment." The signators themselves created this mechanism to insure that the highest level of care possible would be provided throughout the lives of the class members.

Defendants are given responsibility for compensation of the Review Panel members and reimbursement for expenses in paragraph 7(c) of the Judgment, which provides:

Review Panel members and Review Panel staff shall receive appropriate compensation from defendants, on a monthly basis, and shall promptly be reimbursed by defendants for reasonable out of pocket expenses incurred in performing the duties of the Review Panel. Defendants shall at their own expense provide appropriate office space, telephone service, postage, clerical staff, typewriters, and similar support equipment to enable the Review Panel to carry out its duties.

Subsection (g) of paragraph seven provides:

Any interference with the Review Panel, its staff, or with supervisors in connection with their performance of the duties described [in this Judgment], may be punishable as contempt of court and subject to other sanctions provided by law.

Finally, paragraph two of the Judgment provides:

Within their lawful authority, including the State constitution and applicable State laws, and subject to any legislative approval that may be required, defendants are hereby ordered and enjoined to take all actions necessary to secure implementation of the steps, standards and procedures contained in this judgment and Appendix "A" hereto . . . in a prompt and orderly manner. Specifically, defendants shall delegate among themselves and their subordinates responsibility for the appropriate and relevant actions necessary to implement this judgment. Defendants shall take all steps necessary to ensure the full and timely financing of this judgment, including, if necessary, submission of appropriate budget requests to the legislature.

## II. *Review Panel*

The Court believes that the Legislature of the State of New York, by its unfortunate action in deleting the appropriation for the Review Panel, has done a serious disservice both to the members of the Willowbrook class specifically and to the community in general. As explained above, the defendants, on behalf of New York State, have contracted to provide for the creation and financing of the Review Panel. Although some suggestion has been made by counsel for the Attorney General of New York and others that existing state agencies or boards could perform adequately the duties of monitoring which the parties to this action entrusted to the Panel, this Court must disagree. Since it was established in 1975, the Review Panel has performed an invaluable service to the Court in carrying out its responsibility of overseeing the deinstitutionalization of Willowbrook and the implementation of the Consent Judgment. In the words of the Second Circuit Court of Appeals, "the advice, intervention, and assistance of the Review Panel has been of utmost importance in the ongoing attempt to implement the Consent Judgment." *New York State Association for Retarded Children, Inc. v. Carey, et al.,* 596 F.2d at 37.

One of the Panel's principal responsibilities is to audit the provision of care and programs at Willowbrook, the related facilities throughout the metropolitan area, and an increasing number of community placement facilities. Without these audits, the Court and the parties to this action would be unable to determine the extent of compliance, if any, which defendants have achieved under the Steps, Standards, and Procedures of the Consent Judgment. In addition, since 1975 the Panel has issued approximately twenty-five formal recommendations and interpretations of the Judgment regarding a broad range of services to and rights of the retarded class members, including, for example, the provision of educational programs for residents, the hiring of a medical director at Willowbrook, the size of community placements for the seriously and profoundly retarded, the closing of various state facilities for the retarded, the staff and resources available to the Consumer Advisory Board, and other matters of significance to the operation and deinstitutionalization of Willowbrook. Other applications to this Court brought by the plaintiff class have relied heavily not only upon the numerous audits and reports of the Panel, but also upon the expertise and testimony of Panel members and staff. In-

deed, this Court has come to respect and rely upon the competence, integrity, expertise, and judgment of the Review Panel personnel and to appreciate that the Review Panel is largely responsible for the progress which has been made since the era when Willowbrook was described by Senator Robert Kennedy as a "snakepit."

The recent action of the Legislature indicates a shocking lack of comprehension of the working of the Consent Judgment and of the complexity of the problems the resolution of which it is intended to facilitate. The Review Panel is not an unfortunate or undesirable hindrance afflicting the New York State Office of Mental Retardation and Developmental Disabilities in its efforts to serve the retarded. On the contrary, New York State, through its officials, participated in and consented to the establishment of the Panel to insure humane and proper care for the retarded residents of Willowbrook whose constitutional rights to be protected from harm had for years been violated by the state's own neglect. That some members of the Legislature now show so little regard for the Review Panel's work reflects negatively on the extent of their continuing concern for the helpless retarded, and although they might prefer that New York State once again be given the unfettered discretion that it had prior to 1975, this Court will not be a party to such a scheme. Unless we are to return to the horrors of Willowbrook, continued support of the Review Panel is essential.

### III. *Discussion*

The confrontation brought on by this application is not without precedent. The Supreme Court has repeatedly held, in a variety of contexts, that once a constitutional violation has occurred, a court has broad powers to remedy that violation. *See Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971); *Milliken v. Bradley*, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). That this authority is not limited by actions taken by the state legislature has been recognized since the tenure on the Supreme Court of John Marshall. *See*

*United States v. Peters*, 5 Cranch 115, 3 L.Ed. 53, 59 (1808); *Cooper v. Aaron*, 358 U.S. 1, 17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958); *Rhem v. Malcolm*, 507 F.2d 333, 341 n.19 (2d Cir. 1974); *Welsch v. Likins*, 550 F.2d 1122, 1132 (8th Cir. 1977); *Inmates of Suffolk County Jail v. Kearney*, 573 F.2d 98 (1st Cir. 1978); *Dimarzo v. Cahill*, 575 F.2d 15, 18–20 (1st Cir. 1978); *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark.1970), *aff'd*, 442 F.2d 304 (8th Cir. 1971); *Hamilton v. Love*, 328 F.Supp. 1182, 1194 (E.D.Ark. 1971); *Bracco v. Lackner*, 462 F.Supp. 436, 449 (N.D.Cal.1978). Particularly relevant here is the decision of the Court of Appeals for the Eighth Circuit in *Welsch v. Likins, supra*, where the Minnesota Legislature refused to appropriate funds to improve an institution for the retarded pursuant to a court order. In response to a claim that the obligation of the state is subject to what action the legislature may take on a specific budget request, the court stated:

> If Minnesota chooses to operate hospitals for the mentally retarded, the operation must meet minimal constitutional standards, and that obligation may not be permitted to yield to financial considerations . . .

> There must be no mistake in the matter. The obligation of the defendants to eliminate existing unconstitutionalities does not depend on what the Legislature may do, or upon what the Governor may do, or, indeed, upon what the defendants may be able to accomplish with means available to them. As stated, if Minnesota is going to operate institutions like Cambridge, their operation is going to have to be consistent with the Constitution of the United States.

\*   \*   \*   \*   \*   \*

The question is what priority the Legislature, in the face of competing demands for state funds, is willing to accord to its institutions for the mentally retarded. 550 F.2d at 1132. A similar view has also been expressed by the Second Circuit Court of Appeals in *Rhem v. Malcolm*, 507 F.2d at 341, where the court quoted from *Hamilton v. Love, supra*, as follows:

Inadequate resources can never be an adequate justification for the state's depriving any person of his constitutional rights. If the state cannot obtain the resources to detain persons awaiting trial in accordance with minimum constitutional standards, then the state simply will not be permitted to detain such persons.

■ Defendants assert in effect that while there may be precedent for the authority of a court to close an institution rather than permit it to be operated in violation of minimum constitutional standards, this Court has no authority to cite them for contempt in view of their representations to the Court that they are unable either to restore the Review Panel funding to the budget or to find alternative funding sources. It is well settled, however, that a defendant's innocent state of mind or lack of willfulness is no defense to a motion for civil contempt. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191, 69 S.Ct. 497, 499, 93 L.Ed. 599 (1949); *Hospital Association of New York State, Inc. v. Toia*, 428 F.Supp. 848, 851 (S.D.N.Y.1977). While sitting as a court of equity this Court cannot order that the impossible be done, *Natural Resources Defense Council v. Train*, 510 F.2d 692, 713 (D.C.Cir.1975); nevertheless, defendants must show " 'categorically and in detail,' [such impossibility], certainly not less where the obligations in question were accepted in a decree entered on consent." *Aspira of New York v. Board of Education of the City of New York*, 423 F.Supp. 647, 654 (S.D.N.Y.1976), citing *United States v. Fleischman*, 339 U.S. 349, 362–63, 70 S.Ct. 739, 746, 94 L.Ed. 906 (1950); *see also United States v. Swingline, Inc.*, 371 F.Supp. 37, 44–45 (E.D.N.Y.1974) (*per* Judd, *J.*).

■ No such showing of impossibility has been made in this case. Although Commissioner Introne wrote on March 31 to the Director of the Division of the Budget requesting specific action to restore the Review Panel funds and Governor Carey has directed that a supplemental appropriation bill be prepared for submission to the Legislature when it reconvenes on April 14, we remain unconvinced that the Governor, together with the extensive resources, financial and otherwise, at his disposal, has done all within his powers, through formal and informal channels, to see that funding be either restored or replaced. We find particularly disturbing his failure, and that of other officials in the Executive Branch of the New York State government, to act under provisions of the legislative budget which, in our view, would permit them to furnish at least temporarily the relatively minimal funds necessary for the continuing operation of the Panel until such time as the Legislature appropriates the funds. Specifically, we refer to appropriations approved by the Legislature for the Executive Chamber under the line item "contractual services" (State Purposes Budget 1980–81, p. 2, line 24) or for the Department of Mental Hygiene, Office of Mental Retardation and Developmental Disabilities, Executive Management Program under the line items "nonemployee services" (*id.*, p. 135, line 34) and "contractual services" (*id.*, p. 135, line 41), or Quality Assurance Program under similar line item headings (*id.*, p. 136, lines 11 and 18). The funds might also be drawn from items approved for the Staten Island Developmental Center, utilizing, if necessary in the event of subsequent shortages of funds, the interchange authority of Section 51 of the New York State Finance Law. Such actions by defendants would constitute an appropriate means of ensuring that the Panel can continue to function without loss of staff during the period of time reasonably necessary to permit the members of the Legislature to reconsider their action after defendants, through their best efforts, have explained to them the essential role of the Panel in the discharge of New York State's responsibility under the Consent Judgment to protect the constitutional rights of the Willowbrook class members.

Defendants also assert in a supplemental brief that the New York State Constitution prohibits the Governor or any other state official from spending money for a program or purpose specifically deleted from the

budget by the Legislature. To adopt the position that the Legislature can prevent the expenditure of funds which the State has explicitly contracted to provide in order to remedy violations of the United States Constitution, would, it seems to us, render a nullity the Consent Judgment and the constitutional protections embodied in it. Moreover, it is difficult to believe that the Legislature has such an intent, particularly in view of the Legislature's timely appropriation of funding for the Review Panel over the past five years and its recent reaffirmation in the Preamble to the Executive Budget that the "budget . . . reflects . . . the State's continued commitment to comply with the requirements of the Consent Judgment . . . ." If the Legislature properly understands the importance of the Review Panel, this Court believes that it will restore to the budget the Review Panel funds recently omitted. In any event, inasmuch as the Legislature has appropriated other funds at the disposal of defendants and from which the Review Panel may properly be paid, we need not resolve the state constitutional question which defendants have posed.

Accordingly, predicated upon the foregoing, the Court today has entered orders, the mandatory provisions of which are that it is

ORDERED that Governor Carey prepare and submit to the Legislature on or before April 17, 1980 a supplemental budget request or other proper bill providing for an immediate appropriation of funds necessary for the operation of the Review Panel during fiscal year 1980–81, including appropriate compensation and expenses to Review Panel members and staff in the amounts agreed upon by the parties; and it is further

ORDERED that Governor Carey and New York State Office of Mental Retardation and Developmental Disabilities Commissioner James Introne submit to the New York State Office of the Comptroller all vouchers necessary to secure such funding, citing, if necessary, the budget lines discussed above or others from which such funding may be drawn; and it is further

ORDERED that Edward V. Regan, individually and in his official capacity as Comptroller of the State of New York, be joined as a defendant in this action, and that he respect and approve all vouchers submitted to the New York State Comptroller's Office pursuant to the provisions of this order; and it is further

ORDERED that in the event that such funding is not provided on or before April 15, 1980, Governor Carey and Comptroller Regan will be adjudged in contempt of court, and appropriate sanctions will be imposed.