**UNITED STATES of America,
Plaintiff,**

v.

**SWINGLINE, INC., a Delaware corporation, Defendant.**

**No. 71–C–1236.**

United States District Court,
E. D. New York.

Jan. 17, 1974.

Edward J. Boyd, V., Acting U. S. Atty., Brooklyn, N. Y., by Henry A. Brachtl, Asst. U. S. Atty., of counsel, for plaintiff.

Chadbourne, Parke, Whiteside & Wolff, New York City, by Paul G. Pennoyer, Jr., New York City, of counsel, for defendant.

JUDD, District Judge.

## DECISION AND ORDER

This case requires a decision, after a non-jury trial, on the government's right to a civil penalty for delay in complying with a Federal Trade Commission (FTC) divestiture order, and a determination of the amount of any penalty.

### Facts

Proceedings were begun in the Federal Trade Commission by the issuance of a complaint against Swingline, Inc. on April 1, 1968 charging violation of Section 7 of the Clayton Act. 15 U.S.C. § 18. The alleged violation resulted from its acquisition in 1965 of Spotnails, Inc. and Speedfast Corporation, both of which had been engaged in manufacture and sale of heavy duty industrial staplers and fasteners and had been in competition with each other.

Swingline paid approximately $3,-100,000 for Spotnails and $2,500,000 for Speedfast. The evidence did not disclose how much of the prices was attributable to plants, inventory and physical assets, and how much to good will or other factors.

Swingline manufactures personal and commercial stapling devices, fasteners, and other office equipment, and sells its products throughout the United States. In 1965, Spotnails and Speedfast were two of about seven domestic producers of heavy-duty portable industrial staplers and nailers. This is a field in which Swingline had not been engaged before its acquisition of Spotnails and Speedfast.

After the acquisition of Spotnails and Speedfast, Swingline made many changes in the supervisory personnel of the two corporations; Swingline took over the performance of many important corporate functions, and closed some of the plants which the two companies had operated; there was virtually a complete integration of the assets, operating personnel, and sales facilities of the two corporations, and the Speedfast name was dropped. Thus competition between Speedfast and Spotnails was effectively eliminated.

Swingline filed an answer to the FTC complaint, admitting certain allegations, but denying that it had violated the Clayton Act. After proceedings before a hearing examiner, and lengthy negotiations, the parties agreed on a stipulation of facts, a proposed consent order, and a joint memorandum in support of the order.

Since it would have been extremely difficult to restore competition between Speedfast and Spotnails by requiring Swingline to divest itself of one of the corporations, the FTC directed, in the consent order, that Swingline divest itself of a portion of its business, by disposing of some of the assets it had acquired, and providing knowhow and some assured orders to the company acquiring the divested assets.

The Initial Decision of the Hearing Examiner, dated July 30, 1969, recommended entry of an order that would require Swingline to present to the FTC as soon as practicable, but in no event later than one year after the date the order became final, "a financially sound and eligible company" and a contract with such company. The recommended order required Swingline to assure by such contract that "the eligible company" have adequate manufacturing space, machinery, and working capital, that it have royalty free licenses on Spotnails' knowhow and patent rights, and that Swingline would assign specified amounts of customers' orders to "the eligible company" for a three-year period, and furnish technical assistance and other aid to assure that "the eligible company" would be a viable concern.

The order of the FTC adopting the initial decision of the hearing examiner was issued on October 9, 1969 and served on Swingline on October 17, 1969. In a letter addressed to Swingline on November 7, 1969, the Chief of the Compliance Division described this as a final order and directed that detailed compliance reports be filed within sixty days from the effective date of the order (Oc-

tober 17, 1969) and every ninety days thereafter, and described the detailed information which should be included.

When compliance efforts lagged, counsel for Swingline wrote the Commission, on September 15, 1970, that he regarded the effective date of the order as being December 15, 1969 instead of October 17, 1969, on the theory that a sixty day appeal period was allowed after the service of the order, even though the order was uncontested. The Secretary of the Commission responded on October 15, 1970 that no action would be taken to enforce compliance, provided that an eligible company was presented to the Commission for approval on or before December 15, 1970, but warned that

> This letter is not to be construed as acceptance of Swingline's compliance efforts to date. . . .

> In the event that compliance with the applicable order requirements is not effected on or before December 15, 1970, the Commission specifically preserves its right to seek civil penalties.

. . .

### Pleadings in this Action

The complaint in this court, filed September 20, 1971, recites the FTC order and defendant's failure to comply with its requirements before September 1, 1971, and asks for a penalty of $5,000 per day until compliance and a mandatory injunction for the accomplishment of compliance.

Defendant's answer asserts that it made good faith efforts to comply, but was defeated by circumstances beyond its control. Specifically, it asserts that Swingline's business in heavy duty industrial staplers became unprofitable because of changed economic conditions, that it suffered operating losses during 1970, and the first three months of 1971, and that it was therefore impossible to sell the Speedfast assets and impracticable to establish a viable independent business. The answer also asserts that the FTC's denial of an extension of time to comply was arbitrary and capricious, and that the suit was improperly brought because Swingline was given no opportunity to be heard by the FTC before the case was certified to the Attorney General for prosecution.

### Assembly of Data

Swingline did not utilize the time between July 30, and October 17, 1969 to assemble the data necessary to permit divestiture in compliance with the FTC order, and it proceeded after October 17th in a routine manner. Benjamin Hampton, the Executive Vice President of Swingline, asked Sandor Schweiger, the corporate counsel, in October 1969 to prepare a selling document. This was not completed until March 1970. Jack Linsky, President of Swingline, had become seriously ill in September 1969, taking away leadership at an important time.

The Commission wrote to Swingline's counsel on January 13, 1970 requesting additional details concerning compliance, to be submitted not later than January 26, 1970, and asking for a copy of the selling brochure.

Preparation of the selling document involved determining the type of presentation, getting a number of persons to work on various aspects, updating a 1965 report compiled by Booz, Allen and Hamilton, management consultants, and making an inventory of the materials on hand. Many portions of the ultimate brochure were substantially identical with the Booz, Allen and Hamilton report. The Booz, Allen and Hamilton report had been prepared to justify the purchase price of Speedfast, because Jack Linsky, the major stockholder of Swingline, also owned all the stock of Speedfast.

The court finds that there was substantial work required in preparing the selling document, but that the work was done with no sense of urgency on the part of the Swingline staff.

The government criticizes the selling brochure for not listing the right to licenses under the Spotnails patents as

part of the assets to be sold. Swingline counters by saying that the Spotnails patents were to be available only if the new company requested them, and that they were mentioned in an annexed copy of the FTC order. The court regards the omission as significant, in view of the fact that the Spotnails licenses and Spotnails customer list were separately listed in an earlier memorandum from counsel to the officers of Swingline and Spotnails summarizing the FTC order. The "Memorandum in Support of Agreed Upon Order," signed by both parties in the FTC proceeding, had mentioned the existence of patent protection as "The paramount obstacle to new entry in this industry . . ." Sales of Speedfast products having been abandoned, and Spotnails having developed new patents after the Speedfast acquisition, the court regards the omission of reference to Spotnails in the brochure as an effort to get by with the minimum measure of compliance with the FTC order, at risk of not being able to dispose of the assets "as soon as practicable." This omission cannot be attributed solely to Swingline's lackadaisical attitude toward the divestiture.

*Negotiations with Prospective Buyers*

There were news articles about the FTC proceedings in August and October 1969 in the Wall Street Journal and other publications. Inquiries about the acquisition of the Spotnails-Speedfast assets began to come to Swingline shortly after the announcement of the consent decree, and even before it became final.

Swingline responded to each inquiry, but not with any degree of diligence.

DESA Industries Inc. wrote to Swingline on September 9, 1969, even before the FTC order became final, but the brochure outlining the items that it might acquire was not forwarded until March 5, 1970. Negotiations with DESA continued until August 6, 1970, when Swingline was informed that the corporation had no further interest in the matter.

Omark Industries, Inc. wrote on October 27, 1969 about its interest in acquiring the Speedfast assets. Again Swingline delayed until March 5, 1970 before sending a brochure and was slow in its response to inquiries after that date. Negotiations with Omark terminated on September 29, 1970. Omark learned enough from its negotiations to enter the fastener industry itself in 1972.

Discussions with Waldman Corporation were begun in about October 1969. Representatives visited Swingline's Long Island City plant in December 1969, but no offer was obtained.

There were contacts with several other companies.

Swingline did not put a price on its package until about September 1970, and then its figure of $1,250,000 proved to be considerably too high. Swingline states that it was afraid that any price it fixed might be so high as to repel the buyer or so low as to invite a stockholders' suit. It seems to have been more concerned about its relation with stockholders than about its obligation to the FTC. There had been a stockholder suit in 1966 attacking the purchase of Speedfast.

The FTC, in mid-1970, when it noted no progress in divestiture, stated that Swingline should have consulted an investment banking firm. Swingline had considered this unnecessary, but in the summer of 1970 consulted Laidlaw & Co., which wrote to 121 prospects, with no results.

Hilti International, S. A., a Swiss (Leichtenstein) company, began negotiations with plaintiff in September 1970, but did not conclude any arrangement. Swingline had asked Hilti for $1,500,000, including foreign patents. Hilti has also entered the fastener field in competition with plaintiff.

*Creation of a New Company*

Laidlaw & Co. advised against trying to set up a new company, because it would not have sufficient breadth of product to be viable. Nevertheless, this

is the route which Swingline had to follow in order to accomplish the divestiture which the FTC ordered. Negotiations with Lloyd Singer, a former director of Swingline, began in April 1971, and concluded on or about September 3, 1971, when Swingline was finally able to submit an eligible company to the FTC. Singer's connection with Swingline had terminated when American Brands acquired Swingline, as described below.

The price to Singer's new company was only $250,000, payable over a term of years and not in cash. The terms were complicated and presented a different package from what the FTC order contemplated. Swingline had to promise additional support beyond the requirements of the FTC order. Mr. Blakeman, President of Spotnails, Inc., indicates costs of $240,000 over a two-year period to meet Swingline's obligations to the new company.

### Compliance Reports

Swingline's first quarterly compliance report dated December 15, 1969 stated in general terms that it was making efforts to divest itself of the Speedfast assets. It asserted that Swingline had completed its work on a selling brochure, which was being reviewed and edited by a professional public relations firm. It described various efforts to dispose of the Speedfast assets and listed some of the people with whom the company had been in contact, but it did not include either DESA or Omark, in spite of the fact that testimony at the trial indicated that both of them had communicated with Swingline during September or October. The Commission expressed dissatisfaction with the general nature of the report and asked for copies of all correspondence, a list of assets to be included in the divestiture, the price established for the divestiture, and a list of all customers to whom Spotnails was selling on October 17, 1969.

The second quarterly compliance report dated March 17, 1970 listed Omark and DESA among several companies with whom contact had been made, but

it did not supply all the information requested by the FTC after the first report. The attached correspondence indicated that Omark had been informed on October 28, 1969 that it was premature to make contact. A subsequent letter from Omark dated December 8, 1969 asking for the terms and conditions of sale had apparently gone unanswered. The Commission replied under date of March 24, 1970,

It is apparent that Swingline has not taken affirmative steps to locate and develop an eligible company but has relied solely upon requests made to it . . . We find wholly unacceptable both the failure of Swingline to establish an asking price for the to-be divested assets as well as requiring interested parties to take the initiative and submit a bid.

Swingline's third quarterly report dated June 16, 1970 described discussions with DESA, Omark and others and notified the Commission of the acquisition by Spotnails, Inc. of Western Machine & Welding Corp. The Commission's response on July 14, 1970 noted that written communications evidencing negotiations had not been furnished as required by the FTC and that five of the questions put to Swingline in the Commission's letter of January 13, 1970 had not yet been answered.

After receiving Swingline's fourth quarterly report dated August 11, 1970, the Commission called attention to the October 17, 1970 deadline for presenting an eligible company to the Commission and stated that "this request is absolute." This comment resulted in the correspondence described above, in which the Commission agreed not to claim any penalty if an eligible company was presented by December 15, 1970.

Swingline's fifth quarterly report dated October 8, 1970 described further efforts to dispose of the Speedfast business, and attached copies of correspondence with various prospects. The Commission's comment, in a letter of October 16, 1970, called attention to the fact that a list of Spotnails' customers which

had been requested by the Commission on January 13, March 24, and July 14, 1970 had not yet been provided, that financial statements for Spotnails had not been submitted as requested, that there was no evidence of any correction of the selling brochure to include a reference to Spotnails patents, and that the Commission's request of March 24, 1970 for monthly reports of compliance had not been satisfied. A list of five specific sets of documents and information was requested.

*Financial Effects of Delay in Compliance*

The Comptroller of Spotnails testified concerning the revenue and expenses allocable to the assets to be divested and stated that they reflected a loss of $1,470 during the period in which compliance with the FTC order was delayed. His figures, however, involved so many questionable assumptions and so many uncertainties that they are not a satisfactory basis for any finding. The pretax profit of Spotnails as a whole was $170,332 for the period from December 16, 1970 to August 31, 1971. This represented a substantial decline from pretax profits of $664,016 for the fiscal year ended August 31, 1969.

The parties stipulated that Swingline was financially able to pay the maximum penalty of $1,300,000.

During the period after the issuance of the FTC order, Spotnails' share in the market in industrial staplers and fasteners dropped slightly, a circumstance which Swingline cites as evidence that the public interest in preventing monopoly did not suffer during the delay in compliance with the FTC order.

*Impossibility*

Swingline asserts that it was impossible to comply with the FTC order within the time limit because of the business recession of 1969–70. It points out that there was a substantial decline in the number of mergers which took place during that period. This evidence cuts both ways, for it shows that mergers were still possible if people would adjust their terms to the realities of the situation.

In fact, Swingline itself acquired a small tool and die shop early in 1970. During the same year, it also acquired Western Machine Co., a fabricator of machinery. Swingline in turn was acquired by American Brands, Inc. in May 1970. The Treasurer of American Brands, in recommending the purchase to the Chairman of the Board in January 1970, said,

> The company has an excellent growth record and is predicting a 20% increase in both sales and earnings for the current fiscal year.

Swingline's evidence on national economic statistics shows a drop of 0.5% for 1970 in gross national product in constant dollars, and a slump *in growth* of sales of heavy-duty industrial stapling. Such sales were $56.7 million in 1969, $56.9 million in 1970, and $66.9 million in 1971. The opinion expressed by Swingline's expert is not that it would have been impossible to sell Speedfast assets in 1970, but that it would have been "very difficult to find a qualified buyer." There was no evidence that the renewed growth in sales of industrial stapling in 1971 came as a surprise to people in the industry.

Swingline's pricing of the Speedfast package, asking over $1,000,000 in 1970, shows that the failure to comply with the FTC order was attributable more to Swingline's desire to get a good price than to the state of the nation's economy.

*Denial of Extension*

In August 1970, the FTC had informed Swingline that its time to submit an eligible company would expire on October 17, 1970, Swingline responded by letter already described, that the nature of the FTC proceeding had been such that the FTC order did not become final until December 16, 1969, and therefore December 15, 1970 was the effective date for compliance, and the FTC agreed to seek no penalty before that date.

Swingline applied on December 14, 1970 for an extension until April 1, 1971 of the time within which to comply with the FTC order. This request was denied without any specific statement of reasons on January 8, 1971. The FTC expressly referred to its right to seek civil penalties.

## Certification to the Attorney General

On June 14, 1971, the Chairman of the Federal Trade Commission wrote to Attorney General John N. Mitchell certifying that Swingline, Inc. and American Brands, Inc. had violated the divestiture provisions of the Commission's order and transmitting copies of a proposed complaint and a memorandum in support of the complaint.

## The Applicable Law

The statute providing for a civil penalty in this case is Section 11 of the Clayton Act, 15 U.S.C. § 21($l$), which provides:

Any person who violates any order issued by the commission or board under subsection (b) of this section after such order has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of any such order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the commission or board each day of continuance of such failure or neglect shall be deemed a separate offense.

There are relatively few reported cases concerning the determination of the amount of a civil penalty. Both decided cases and reported settlements appear generally to fix a round figure rather than to compute the amount on the basis of a specific daily penalty.

The provision for institution of an action for a civil penalty is in Section 16 of the Federal Trade Commission Act, now 15 U.S.C. § 56, which reads:

Whenever the Federal Trade Commission has reason to believe that any person, partnership, or corporation is liable to a penalty under section 54 of this title or under subsection ($l$) of section 45 of this title, it shall certify the facts to the Attorney General, whose duty it shall be to cause appropriate proceedings to be brought for the enforcement of the provisions of such section or subsection.

## The Defense of Impossibility

■ There is no need to determine whether impossibility of performance is a defense to failure to obey a FTC order. The proof here falls far short of showing impossibility. The most it shows is that performance was difficult and that it would have required more intensive effort than Swingline was willing to devote to the task.

■ Swingline's argument boils down to the double contention (a) that its delay in compliance was not wilful and (b) that it acted in good faith. The court finds that the delay was not wilful, but the lack of diligence in attempting to comply prevents an affirmative finding of good faith.

■ A civil penalty is somewhat like a punishment for civil contempt, in that its imposition does not depend on wilfulness.

■ Disobedience of a court order need not be wilful in order to support a finding of civil contempt. McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949) (violation of Fair Labor Standards Act); National Labor Relations Board v. Local 282, 428 P.2d 994, 1000–1001 (2d Cir. 1970). While mere negligence may not be enough to support a finding of contempt, a lack of diligent effort to comply with the order is significant. As was stated in a trademark case, Babee-Tenda

Corp. v. Scharco Mfg. Co., 156 F.Supp. 582, 587 (S.D.N.Y.1957):

> They were required to take energetic steps to see that the orders of the court were carried out.

■ Inability to comply with a court order may be a defense to a charge of contempt, United States ex rel. Emanuel v. Jaeger, 117 F.2d 483, 488 (2d Cir. 1941), but not if the defendant created his own inability. In re D. I. Operating Co., 240 F.Supp. 672, 677 (D.Nev.1965).

■■ Similar rules apply to FTC orders. Arguments that divestiture would be difficult or even impossible are not a defense to an action for civil penalty, although they may have a bearing on the extent of the penalty. United States v. Beatrice Foods Co., 344 F.Supp. 104, 116 (D.Minn.1972). Lack of intent to violate the order is not a defense to liability, but only a factor to be considered in mitigation of the penalty. United States v. H. M. Prince Textiles, Inc., 262 F.Supp. 383, 389 (S.D.N.Y.1966); United States v. Vitasafe Corp., 212 F.Supp. 397 (S.D.N.Y.1962).

This case is not like United States v. St. Regis Paper Co., 285 F.2d 607, 614 (2d Cir. 1960), aff'd, 368 U.S. 208, 82 S.Ct. 289, 7 L.Ed.2d 240 (1961), where the court recognized that a claim of "an honest mistake in a good-faith attempt to comply" might be raised in mitigation of the penalty. Nor is it like Kerr Steamship Co. v. United States, 284 F.2d 61 (2d Cir. 1960), cert. granted, case vacated and remanded with instruction to dismiss appeal as moot, 369 U.S. 422, 82 S.Ct. 974, 7 L.Ed.2d 847 (1962), where there was a question of the intent and meaning of a Federal Maritime Board order.

■ Moreover, as the court held in United States v. Beatrice Foods Co., *supra*, 344 F.Supp. 104, penalties may be imposed for a failure to comply with a divestiture order as well as for affirmative acts in violation of an FTC order.

*Extension of Time*

■ The right to an extension of time to comply with an order rests in the discretion of the Federal Trade Commission. 16 C.F.R. § 4.3(b). The denial of an extension of time cannot be criticized as arbitrary in this case, in view of Swingline's slow start, its failure to respond effectively to the Commission's comments on its quarterly compliance reports, the warning of the compliance date that was given it in August, and the acceptance by the Commission in October 1970 of Swingline's excuse that it thought it was entitled to count the sixty-day appeal period in determining when the order became final. There was no need for the FTC to spell out the reasons for denying an extension of time.

*Certification*

■ Neither the statute nor the regulations require that the FTC give notice to a party before certifying a case to the Attorney General for an enforcement proceeding. The fact of violation being clear, the only reasons a respondent could give to persuade the Attorney General not to proceed would be the same reasons that are appropriate to present to a court in mitigation of the amount of the penalty.

The FTC told Swingline on August 11, 1970 that it should present an eligible company by October 17, 1970 and that "this request is absolute." When it acquiesced in a later deadline, the Commission stated only that it would not claim a penalty if an eligible company was presented by December 15, 1970. No further notice of an intention to seek a penalty was necessary.

■ Even if these notices were not in the case, the assertion that in some cases respondents have been permitted to submit memoranda prior to certification does not make such a submission a condition precedent to an action. The purpose of the "Finality Act" was to expedite enforcement, not to cumber it with the sort of obstacles which Swingline would interpose. Federal Trade Commission v. Jantzen, 386 U.S. 228, 231, 87 S.Ct. 998, 1000, 18 L.Ed.2d 11 (1967); Federal Trade Commission v.

Henry Broch & Co., 368 U.S. 360, 365, 82 S.Ct. 431, 7 L.Ed.2d 353 (1962).

■ Certification was necessary only to provide authority for the Attorney General to bring the action. United States v. St. Regis Paper Co., 355 F.2d 688 (2d Cir. 1966). There is nothing in 15 U.S.C. § 56 to indicate that Congress intended to require an adversary proceeding between the violation of an order and the institution of an action.

Defendant refers to an amendment of 16 C.F.R. § 3.61(a) on March 17, 1972 which expressly referred to certification of facts to the Attorney General "without advising a respondent whether the actions set forth in a report of compliance evidence compliance with the Commission's order." This language may properly be treated as declaratory of proper procedure rather than as eliminating a step previously required. In any event, Swingline could not have been under any misapprehension that it had complied with the order in this case. It had been clearly informed that its reports did not show compliance.

*The Amount of Penalty*

■ The amount of penalty depends on the facts of each case. There are relatively few reported decisions on violations of FTC orders.

In the *Beatrice Foods* case, supra, it appears from information in the parties' memoranda that the penalty was fixed at $9,800 or only $200 a day. On the other hand, in United States v. ABC Consolidated Corp., 1968 Trade Cas. ¶ 72,621 (E.D.N.Y.1968), where the government asked for $319,000 on the basis of $1,000 per day, the penalty was fixed by agreement at $200,000 for a delay of about eleven months in complying with a divestiture order. (The amount appears in the trial memorandum here, although not in the reported opinion).

In the *Vitasafe* case, the government asked for a penalty of $50,000 and was granted $18,000 (see 352 F.2d at 62 (2d Cir. 1965)). In the *Prince Textiles* case, the penalty was fixed at only $250 for each violation, whereas the govern-

ment had asked for the maximum ($5,000). 262 F.Supp. at 387, 389.

In other types of cases, civil penalties have been relatively modest. The Civil Aeronautics Board imposed a fine of only $65,000 upon the Penn Central Company for devious, flagrant and persistent violation of the statutes against a common carrier by rail having an interest in an air carrier. See Daughen & Binzen, The Wreck of the Penn Central (Signet ed. 1973), pp. 166–67. The maximum potential penalty in the *Penn Central-Executive Jet* case might have amounted to $7,000,000; but the venture had caused severe losses to Penn Central, and the violation did not involve disobedience of an order previously entered.

In the *Alitalia* case, where this court had found that Alitalia was selling tickets at an illegal discount, Civil Aeronautics Board v. Alitalia-Lines Aeree Italiane, 328 F.Supp. 759 (1971), the Board rejected a $30,000 settlement offer and ultimately settled the case for $50,000, although potential penalties were over $2,000,000. CAB Order 72–8–3, Aug. 1, 1972. Again, this involved violation of a statute whose application was contested and not of a specific Board order.

■ Among the factors recently listed by Judge Motley in United States v. J. B. Williams Co., Inc., 354 F.Supp. 521, 548 (S.D.N.Y.1973), to be considered in determining the amount of civil penalties in an FTC action are

> their financial ability to pay the penalties demanded, the degree of harm which defendants may have caused . . . and their good or bad faith
>
> . . . .

Other factors may include the nature of the excuses for delay and the extent to which defendant has profited by failing or delaying to comply.

■ In this case, financial ability is not a primary factor. Swingline has the ability to pay the full penalties demanded. However, the amount asked is substantial in relation to its total assets and its annual profits.

The harm caused by Swingline's delay is difficult to assess. The harm may have been less serious than the harm caused in the *Williams* case, where the respondents continued publishing misleading advertisements after an order to cease publishing them; but Swingline's delay had a significant effect on the public interest. The suppression of competition, initiated in 1965, continued until September 1971, at least nine months beyond the time when the FTC said that competition should have been restored. The restoration of competition was made more difficult and precarious because it required revival of the Speedfast goodwill, which had grown more stale with each day's delay.

The degree of good faith was rather low in this case. There was no excuse for the delay from July 30, 1969, when the form of order was agreed on, or at least from October 17, 1969, when the order was certified by the FTC, until March 1970, when a selling brochure was finally developed; there were long delays in following up expressions of interest which had been received as early as September and October 1969; Swingline endeavored to avoid giving a license for Spotnails patents by excluding any reference to them in the brochure and leaving it to the purchaser to dig the information out of the annexed FTC report; there was a long failure to put a price on the package; and there were continued failures to furnish information requested by the FTC.

Swingline's default in this case is not comparable to that in United States v. Northern Pacific Ry., 242 U.S. 190, 37 S.Ct. 22, 61 L.Ed. 240 (1916), where the Supreme Court referred to an "unintentional omission or mistake."

There was no real excuse for the delay. Swingline refers to difficult economic conditions during 1970. These conditions did not, however, prevent it from being involved in two acquisitions and one merger during 1970. The conditions simply called for "energetic steps" (see Babee-Tenda v. Scharco Mfg. Co., *supra*, 156 F.Supp. at 587), which Swingline did not take.

The benefit Swingline received from its delayed compliance was minimal, even if half of the $170,000 profits of Spotnails could be attributed to the retention of the assets which should have been divested. On the other hand, the costs of its ultimate compliance have turned out to be very large. The price promised it by the new company was a mere fraction of the evaluation which Swingline originally put on the assets. The amount which Swingline has spent on special services to comply with the order is almost equal to the total consideration of $250,000 which it was promised. Swingline thus has suffered substantial loss through being forced to divest in haste after a further extension of time was denied and through having to assume onerous obligations to the new company beyond the requirements of the FTC order.

In this case, the penalty should not approach the maximum, but should be large enough to hurt, and to deter anyone in the future from showing as little concern as Swingline did for the need to meet an FTC time-table.

A penalty of $150,000 is determined to represent fair consideration of all the factors listed.

### Injunction

Swingline has now divested itself of the assets described in the FTC order and complied with its obligations to the new company. There is no showing of particularized need for injunctive relief against any future obligations under the FTC order.

This decision is intended to comply with the requirements of F.R.Civ.P. 52 concerning findings of fact and conclusions of law.

It is ordered that the amount of the civil penalty payable to the United States by Swingline, Inc. be fixed at $150,000, that the prayer for injunctive relief be denied, and that the Clerk of Court enter judgment for plaintiff as set forth above.