Elizabeth FUJIWARA and Ira Vanterpool, Plaintiffs,

v.

Charles G. CLARK, Individually and in his capacity as Superintendent, Department of Education, State of Hawaii, Thomas Yamashita, Individually and in his capacity as Director, Management Audit and Civil Rights Branch, Department of Education, State of Hawaii, Rev. Darrow L. K. Aiona, Hubert P. Minn, George S. Adachi, Dr. Richard Ando, Marion Saunders, Ruth Tabrah, Howard I. Takenaka, Hiroshi Yamashita and Noburo Yonamine, in their capacities as Members, Board of Education, State of Hawaii, Defendants.

Civ. No. 78–0062.

United States District Court, D. Hawaii.

July 20, 1979.

See also D.C., 477 F.Supp. 822.

Paul Alston, Honolulu, Hawaii, for Fujiwara.

American Civil Liberties Union of Hawaii, Honolulu, Hawaii, Mary Blaine Durant, Honolulu, Hawaii, for Vanterpool.

Lawrence D. Kunabe, Robin K. Campaniano, Deputy Attys. Gen., Honolulu, Hawaii, for defendants.

## ORDER DENYING MOTION FOR CONTEMPT

SAMUEL P. KING, Chief Judge.

On February 25, 1977 and June 3, 1977, respectively, plaintiff Vanterpool, an experienced worker in civil rights matters, and plaintiff Fujiwara, the former executive director of the local ACLU affiliate, were hired by the Department of Education [hereinafter "DOE"] as certified non-probationary temporary employees in the Management Audit and Civil Rights [hereinafter "MACR"] Branch. Plaintiffs had responded to job vacancy announcements that had been posted by the DOE. Plaintiff Vanterpool, hired as a Staff Specialist II (equal education opportunities coordinator), reported to defendant Yamashita, Director of the MACR Branch; plaintiff Fujiwara, who was classified as a Staff Specialist I (equal education opportunities specialist), reported to plaintiff Vanterpool.

Plaintiffs were hired to provide temporary technical assistance for the remainder of the fiscal year 1976–1977 in the programming and monitoring of the DOE's compliance with the several applicable federal

laws and regulations in the civil rights area, especially Title IX of the Education Amendments of 1972. Such technical assistance was subsidized for one fiscal year by federal funds under a grant contract between the DOE and the United States Office of Education [hereinafter "USOE"].[1] Each grant contract was contingent upon the acceptance by the USOE of the DOE's annual application for funds.

Each application for federal funds was required to set forth the nature and type of assistance sought and the amount of money desired for each fiscal year extending from July 1 to June 30. The DOE applied for grant contracts for the fiscal years 1976–1977 and 1977–1978. Both applications were premised upon similar program objectives:

*PROGRAM OBJECTIVES* (Benefits are inherent and self-evident)

1. To identify and, where possible, eliminate *biased learning materials* which restrict women and members of racial and ethnic minorities.

2. To develop *compensatory techniques* to counteract the detrimental effects of sex-biased materials currently in use.

3. To establish a control structure within which specific recommendations for program development may be evaluated and implemented by persons with a direct responsibility for *girls' athletics.*

4. To minimize the effects of minority and/or ethnic isolation, especially with difficulties associated with *immigrant students.*

5. To provide technical *liaison assistance* to various non-participating agencies currently operating education programs.[2]

The DOE received federal funds to employ plaintiffs and other temporary project staff for fiscal year 1976–1977 under Federal Contract # C309–77–0003. Plaintiffs' temporary positions terminated upon the expiration of such contract on June 30, 1977. They were subsequently rehired for fiscal year 1977–1978 because a federal subsidy was again available under a new grant contract, Federal Contract # C309–77–0004.

Unbeknownst to defendants, plaintiffs scheduled several press conferences to publicize a Pacific Regional Conference on Civil Rights Compliance in Schools that was to be sponsored by the DOE. Plaintiffs informed the news media that the DOE was not in full compliance with civil rights legislation requiring equal opportunities for students, equal employment opportunities, and non-discrimination based on race, sex or handicap. Despite defendant Clark's subsequent warning against holding any news conferences without first advising defendant Yamashita, plaintiffs met the press again without defendants' authorization on December 26, 1977 to discuss the civil rights conference. During this press conference, plaintiff Vanterpool predicted that the state would lose $30.5 million in U.S. education funds by failing to comply with equal opportunity laws. Defendant Clark reacted strongly to plaintiffs' publicized opinions and held a news conference to refute plaintiffs' contentions.

On January 30, 1978, defendant Yamashita submitted by letter a Recommendation for Discharge of Mr. Vanterpool and a Recommendation for Discharge of Ms. Fujiwara to defendant Clark, the Superintendent of the DOE, pursuant to Regulation # 5110 of the School Code and Article V, Rights of the Employer of Unit 6 Educational Officers Collective Bargaining Agreement. Each letter set forth "facts leading to my recommendation for discharge" which included, *inter alia*, that plaintiffs scheduled a news media conference concerning a civil rights conference without advising defendant Yamashita or defendant Clark that they would be discussing matters

1. The federal funds were authorized pursuant to Title IV of the Civil Rights Act of 1964, and specifically Part 180, Chapter I, Subtitle B of Title 45 of the Code of Federal Regulations.

2. Defendants' Memorandum in Opposition to Motion for Contempt at 10 (filed February 23, 1979).

of statewide concern to the DOE; that plaintiffs subsequently called two other news conferences in which they incorrectly maintained that the DOE would lose $30.5 million in federal funds if equal education opportunity laws were not complied with by July 1978 and that the DOE was not in full compliance with Title IX requirements; and that plaintiffs continued to hold news conferences concerning the civil rights compliance program despite several warnings by defendant Clark against making public statements about the DOE without advising defendant Yamashita or defendant Clark.

By letter dated January 31, 1978, defendant Clark notified each plaintiff of his receipt of defendant Yamashita's recommendations and suspended them from employment without pay, effective January 31, 1978, pending final disposition of the recommendation for discharge.

Effective February 8, 1978, defendant Clark terminated the employment of plaintiffs. Soon after plaintiffs were fired, the DOE promulgated new internal regulations for news releases and press conferences by personnel in the MACR Branch which specifically required that all personnel must procure the approval of defendant Yamashita prior to conferring with the press.

On February 10, 1978, defendant Clark appointed defendant Yamashita to replace plaintiff Vanterpool as project director of the grant (# C309–77–0004) under which plaintiffs had been employed.

On February 22, 1978, defendant Yamashita implemented MACR Branch Procedure No. 11 which pertains to "Civil Rights Complaint Investigative Procedure." This regulation grants substantial investigative authority to the DOE's Civil Rights Coordinator, or an assigned staff member, once a complaint has been filed.

Plaintiffs' terminations and the incidents leading up to the terminations resulted in the complaint filed in this court on February 24, 1978. In their claim for injunctive relief and damages pursuant to 42 U.S.C. § 1983, plaintiffs allege that they were discharged for exercising rights of free speech guaranteed to them by the First and Fourteenth Amendments and in violation of substantive and procedural rights of due process guaranteed to them by the Fourteenth Amendment. A temporary restraining order was denied on February 24, but a preliminary injunction was granted on March 8, 1978. As a result, plaintiffs were reinstated in their respective positions but immediately placed on administrative leave.

On April 3, 1978, defendant Clark approved a reorganization of the civil rights office proposed by defendant Yamashita whereby plaintiffs were placed under the direct supervision of defendant Yamashita. This reorganization was subsequently approved by the governor on June 27, 1978.

After hearing extensive oral arguments, this Court issued an injunctive order on June 29, 1978 that restored plaintiffs to their former positions with all accrued employee benefits and enjoined defendants from disciplining, demoting or dismissing plaintiffs primarily because of their statements to the press. The injunction embodied a memorandum of decision issued on June 8 wherein it was emphasized that the decision does not restrict officials of the DOE from defining or redefining plaintiffs' duties or responsibilities to bring them within the category of positions "where the interests to the State might justify stricter control over an employee's public statements," nor should it be construed to imply that "either plaintiff has any greater right to continued employment than he or she would have had without regard to (what I have held to be) the abortive attempt to discharge them under Superintendent Clark's letters of February 7, 1978."[3] The injunction was premised on a finding that plaintiffs had been fired in substantial part for exercising their right to speak on issues of public importance in violation of protection accorded them by the First Amendment.

Subsequent to the issuance of the injunctive order, plaintiffs were reinstated with back pay and all accrued benefits; however, they remained on paid administrative leave until July 26, 1978.

**3.** Memorandum of Decision at 18 (filed June 8, 1978).

On June 20, 1978, defendant Clark approved a request made by defendant Yamashita on May 17, 1978 to redefine plaintiffs' job descriptions.[4]

4. Plaintiffs provided a side-by-side comparison of their original and revised duties. *See* Plaintiffs' Supplemental Memorandum in Support of Motion for Order Citing Defendants for Contempt of Court at 10–13 n. 6 (filed January 24, 1979).

Plaintiff Vanterpool

Original Job
(Exhibit H)

Revised Job
(Exhibit F)

1. Provides advice and technical assistance to state and district staff in regards to interpretation and implementation of federal and state directives regarding equal educational opportunities.

1. Upon request or as directed by the Director, provides technical assistance and advice to departmental personnel on the interpretation or implementation of equal employment and educational opportunity laws, regulations, policies and plans. Keeps abreast of civil rights developments on the national, state and local levels to fulfill responsibilities for the provision of technical assistance and advice within the department.

2. Represents the Superintendent by investigating complaints of discrimination in the Department. Works with Office of Personnel Services staff to investigate complaints *of discrimination in employment,* and Office of Instructional Services staff to investigate complaints of discrimination in educational programs and activities.

2. Recommends the establishment and improvement of an administration system for civil rights in the department. Conducts research and studies as are necessary to establish or improve the department's administrative system for civil rights.

3. Develops, maintains, conducts and/or coordinates orientation and training programs for administrative staff in areas such as ethnic isolation, sex bias and affirmative action. Provides this training to other interested non-profit organizations as schedules *and funding permit.*

3. As assigned, conducts fact-gathering and investigation of civil rights complaints.

4. Provides assistance in identification and assessment of awareness problems and implementation of projects designed to eliminate these problems. Assistance consists of providing consultation or consultants, coordinating efforts within and between individual schools, complexes and district offices, providing resource materials and dissemination of program information.

4. As directed, plans, conducts and coordinates orientation and training programs for departmental personnel as related to equal employment and educational opportunity.

5. Develops project proposals, hires and supervises staff, develops and expends budget and prepares evaluation reports for Title IV Civil Rights project. Meets regularly with HEW staff, federal program staff and EEO coordinators from other educational agencies in order to secure the most current information and resources for the Department.

5. As directed, reviews departmental employment practices and educational programs to determine compliance with equal employment and educational opportunity provisions of the federal and state government. Reports findings and recommendations to the Director for appropriate disposition and action.

| Original Job (Exhibit H) | Revised Job (Exhibit F) |
|---|---|
| 6. Acts as liaison for the Superintendent between and among the school districts and other community agencies to insure maximum benefit from funds and resources. This involves providing a central information source of individual projects to maintain control and provide resource information for other schools/districts to adapt or adopt for their use. | 6. As directed, serves as the Director's designee in maintaining liaison with various commissions, councils, committees, agencies and groups on matters relating to equal employment and educational opportunity. |
| 7. Represents the Superintendent on various councils and committees formed to enhance equal educational and employment opportunities in the Department and the State. Provides technical assistance and information about the Department's program to various non-DOE agencies currently operating education programs. | 7. Performs other related duties as may be required or directed. |
| 8. Is the primary contact person with the General Assistance Center of the Pacific to coordinate the services of the Center with the various state and district offices. | |

Plaintiff Fujiwara

| Original Job (Exhibit G) | Revised Job (Exhibit E) |
|---|---|
| 1. Provides advice and technical assistance to state, district, and school staff in regards to interpretation and implementation of federal and state directives pertaining to equal educational opportunities. | 1. Assists in providing advice and technical assistance to state, district and school staff in regards to interpretation and implementation of federal and state directives pertaining to equal employment and educational opportunities. |
| 2. Researches, compiles, and disseminates information on current laws, policies, rules and regulations, adjudications, guidelines pertinent to promoting equal educational opportunities as they may apply to the DOE. | 2. Participates in researching and compiling information on current laws, policies, rules and regulations, adjudications, guidelines, pertinent to promoting equal employment and educational opportunities as they may apply to the Department of Education. |
| 3. Assists in conducting needs assessment and arranges for in-service training of state, district, and school administrators and staff to increase their awareness of conditions which prevent or compromise equal educational opportunities, and to improve their administrative skills in causing corrective action or affirmative action to take place. | 3. Assists in conducting needs assessments and in arranging for in-service training of state, district, and school administrators and staff to increase their awareness of conditions which prevent or compromise equal employment and educational opportunities, and to improve their administrative skills in taking corrective and affirmative action. |
| 4. Participates in review and analysis of new and existing educational programs and services of the department, in collaboration with appropriate state, district, and school staff, for compliance with affirmative action program commitments. | 4. Participates in reviewing and analyzing new and existing employment programs and services of the Department of Education in collaboration with appropriate state, district and school staff, for compliance with civil rights laws and affirmative action program commitments. |
| 5. Assists in investigating complaints and grievances relating to alleged biases and discriminatory practices in the educational programs and services of the department. | 5. Assists in investigations of complaints and grievances relating to alleged biases and discriminatory practices in the employment and education programs and services of the Department of Education. |

On July 3, 1978, defendant Clark received a letter from John Palomino, Regional Compliance Officer for the Equal Employment Opportunity Commission, who had visited Hawaii in 1978 to investigate the DOE's programs in compliance with the requirements of Title IX of the Education Amendments of 1972, Title VI of the Civil Rights Act of 1964 and Section 504 of the Vocational Rehabilitation Act of 1973. Mr. Palomino summarized the perceived needs of the project and the DOE's expressed commitment to meet these needs which included *inter alia* the DOE's promulgation and implementation in the 1978–79 school year of student and employee grievance procedures for Title IX grievances; the dissemination of brochures concerning Title IX and other civil rights laws to all students and DOE staff; the distribution to all schools of Title IX guidelines; the submission to the Office of Civil Rights [hereinafter "OCR"] of the results from the DOE's computer monitoring of each school's athletic department's expenditures by sport and sex and provisions for uniforms and coaches in 1978; the development of a monitoring program for the 1978–79 school year to determine the number of sex-separate physical education classes in junior and senior high schools and goals to eliminate these classes; and the submission in March 1979 of a progress report to the OCR concerning the fulfillment of these goals.

On July 26, 1978, plaintiffs returned to work. Two days later they were notified that their jobs would be terminated on August 31, 1978.

In his closing quarterly report to the USOE for 1977–78, defendant Yamashita reviewed the DOE's accomplishment of many project goals in its compliance effort for that year. Despite plaintiffs' absence for nearly half of the fiscal year, the completed tasks included: training seminars on sex bias and discrimination for district and state affirmative action coordinators, an affirmative action conference, the institutional self-evaluation for Title IX, the formulation of an administrative manual and civil rights grievance procedures for all students and employees of the DOE, coordination with various DOE and State agencies and organizations concerned with civil rights, and the development of Title IX compliance monitoring instruments for the physical education and athletic programs of the DOE for implementation in the 1978–79 school year.

In furtherance of those objectives set forth in the DOE's previous applications for federal funds, defendants submitted another grant application for 1978–79 in May 1978. Defendants Clark and Yamashita recall that the application provided for an increase in project staff to meet the DOE's compliance efforts.[5] The USOE subsequently required defendants to withdraw this new application, which was based on newly proposed regulations of the USOE, until final regulations were promulgated. Because the issue date of these final regulations was uncertain, the USOE granted the DOE's request to extend the 1977–78 program through August 31, 1978.

The status of plaintiffs' temporary employment with the DOE is reflected in the

Plaintiff Fujiwara—Continued

| Original Job (Exhibit G) | Revised Job (Exhibit E) |
|---|---|
| 6. Serves as a resource person on the subject of DOE efforts to enhance equal educational opportunities, and maintains liaison with other local and federal government agencies, community groups, and interested organizations and individuals. | 6. Serves as a resource person on the subject of Department of Education efforts to enhance equal education and employment opportunities, and assists in maintaining liaison with other local and federal government agencies, community groups, and interested organizations and individuals. |
| | 7. Performs other related duties as required or directed. |

---

5. *Plaintiff's Supplemental Memorandum in Support of Motion for Order Citing Defendants for Contempt of Court* at 16.

DOE's Notification of Personnel Action form dated July 21, 1978. It is stated therein that the date of plaintiffs' termination of employment may be extended pending the availability of federal funds. Because federal funds were still available under Federal Contract # C309–77–0004, plaintiffs were retained during the extension period to continue to provide technical assistance.

Defendants Clark and Yamashita had determined that a further extension of grant beyond August 31, 1978, would be unnecessary as they anticipated the completion of most of the project goals in the compliance effort by then. Consequently, defendant Yamashita refused the USOE's offer to extend the project through September 1978.

On July 26, 1978, the USOE issued its final grant regulations. The new regulations required that separate proposals be submitted for financial assistance in the areas of sex bias and bias based on national origin.

On August 21, 1978, with defendant Clark's approval, defendant Yamashita submitted a revised grant application to the USOE.[6] The new proposals dispensed with the need for outside technical assistance in an attempt by defendants to increase the civil rights responsibilities of permanent DOE personnel. This was to be accomplished by decentralizing the responsibilities of the temporary investigative and technical assistance staff and relying more on existing state and district affirmative action coordinators who had been appointed when the first grant application was filed in May 1975. The new proposal called for a highly placed "Special Assistant to the Superintendent" who would serve as a consultant for sex discrimination and national origin discrimination problems and assist the state and district affirmative action co-ordinators. After the submission of this revised application, the original 1978–79 application submitted in May 1968 was discarded in accordance with normal DOE practice.

Defendants' revised 1978–79 application for funds was not accepted totally by the USOE. The project funding was reduced because it was determined that further technical assistance was not needed to conduct programs in the racial and national origin discrimination area and that the need for technical assistance in the sex discrimination area had diminished.

On August 23, 1978, plaintiffs filed a Motion for Order Citing Defendants for Contempt of Court. In this motion, plaintiffs argue that defendants violated the permanent injunction issued on June 29, 1978, by demoting plaintiffs and intentionally terminating them from employment on August 31, 1978, without proper cause. They contend that defendants' actions were primarily motivated by their continued furor over plaintiffs' unauthorized statements to the press concerning the DOE's civil rights compliance program. A hearing was held on March 14, 1979.

■ The parties are not in dispute over who must bear the burden of proof in a civil contempt motion. The established rule in the federal courts is that the burden rests on the plaintiff to show by clear and convincing evidence that defendants have violated a direct order of the court. All reasonable doubts must be resolved in favor of the defendant. *See, e. g., Hanley v. Pacific Livestock Co.,* 234 F. 522 (9th Cir. 1916); *N.L.R.B. v. Alamo Exp. Co.,* 395 F.2d 481 (5th Cir. 1968); *Hart, Schaffner & Marx v. Alexander's Dept. Stores, Inc.,* 341 F.2d 101 (2d Cir. 1965).

---

**6.** Program objectives for 1978–79 fiscal year included *inter alia* that DOE would provide technical assistance in the promulgation of civil rights complaint procedures for students and DOE employees, develop Title IX guidelines for distribution to all schools, monitor each school's athletic expenditures by sport and sex, render technical assistance in sex and national original discrimination investigations of civil rights grievances, train district and state civil rights coordinators in monitoring educational and employment programs for compliance with sex discrimination laws, and develop a computerized system for civil rights monitoring and reporting. *See* Plaintiffs' Supplemental Memorandum in Support of Motion for Order Citing Defendants For Contempt of Court, Exhibit GG.

Plaintiffs admit they are unable to produce any direct and compelling evidence to show that defendants conspired to demote and subsequently terminate plaintiffs for exercising their First Amendment rights. Nevertheless, they attempt to show by circumstantial evidence that defendants' refusal of the USOE's offer to extend the 1977–78 contract through September 30, 1978 and the revision of the 1978–79 proposal that eliminated plaintiffs' positions, was a retaliatory response to plaintiffs' criticism of DOE policies. Whether plaintiffs' attempt to meet the heavy burden of proof by introducing direct or circumstantial evidence, it must be done by clear and convincing evidence.

Plaintiffs rely on *United States v. Swingline, Inc.,* 371 F.Supp. 37 (E.D.N.Y.1974) to support their contention that defendants' failure to assert a good faith diligent effort to comply with the injunctive order will support a motion for contempt. Otherwise, plaintiffs must show that defendants willfully defied the court order. Plaintiffs argue that defendants' superficial claims of compliance and revised program needs created circumstances which made it impossible for them to honor the injunctive order.[7]

Plaintiffs also argue that the defendants' decision to terminate their employment may stand only if defendants can meet the burden of proof established in *Mt. Healthy Board of Ed. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).[8] The Court held that initially "the burden was properly placed upon [plaintiff] to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor' —or, to put it in other words, that it was a 'motivating factor' in the . . . decision not to rehire him." *Id.* at 287, 97 S.Ct. at 576. Once this burden is met, defendants must prove that their decision to terminate plaintiffs' employment was not influenced by plaintiffs' public comments and would have been made even if plaintiffs had not exercised their right to free speech.

Plaintiffs feel they have met their burden of proof by arguing that the 1977–78 civil rights program was improperly terminated on August 31, 1978, despite the need and availability of funds to continue it through September, and that defendants purposely revised the 1978–79 program in its grant application to the USOE to eliminate plaintiffs' positions. These decisions, plaintiffs argue, must have been motivated by defendants' desire to castigate plaintiffs for

7. In 1965, Swingline, a manufacturer of office equipment, acquired Spotnails, Inc., and Speedfast, Corp., both of which were engaged in the manufacture and sale of industrial staplers and fasteners. In violation of § 7 of the Clayton Act, Swingline proceeded to integrate its personnel, sales facilities and assets with those of Speedfast, which effectively eliminated any competition between Spotnails and Speedfast. To avoid any further infringement of § 7, the Federal Trade Commission (FTC) ordered, *inter alia,* that Swingline submit to the FTC within one year a contract between Swingline and "a financially sound and eligible" company which had independent and adequate manufacturing space, machinery and assets. 371 F.Supp. at 39. Swingline failed to respond with any degree of diligence to inquiries from companies that desired to negotiate a contract. The New York District Court held Swingline in contempt for violation of the divestiture order. The contempt order was not premised on Swingline's deliberate disobedience of the order, but that Swingline had deliberately delayed compliance with the court order. Swingline contended that the economic conditions of 1969–70 made it impossible to comply within the time limit set by the court. The court found no justifiable reason for the delay. "Inability to comply with a court order may be a defense to a charge of contempt, . . . but not if the defendant created his own inability." 371 F.Supp. at 45. (citations omitted)

8. In *Mt. Healthy,* the Supreme Court reaffirmed a nontenured teacher's right to reinstatement "if the decision not to rehire him was made by reason of his exercise of constitutionally protected First Amendment freedoms." 429 U.S. at 283–84, 97 S.Ct. at 574. The Court, however, went on to say that a "borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct" but that he "ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision." *Id.* at 286, 97 S.Ct. at 575.

their public statements because they occurred soon after plaintiffs returned to work and had consequences similar to plaintiffs' illegal terminations of February 8, 1978. Plaintiffs argue that they are therefore entitled to reinstatement unless defendants can show by a preponderance of the evidence that they would have terminated plaintiffs despite the occurrence of their protected First Amendment activities.

 Plaintiffs' arguments are unpersuasive. To maintain an action for civil contempt, plaintiffs must show that a definite violation of an unequivocal court order has occurred. Defendant may not be held in contempt for actions which were not expressly written in the court order. *H. K. Porter v. Nat. Friction Products*, 568 F.2d 24 (7th Cir. 1977).[9] Therefore, before plaintiffs can use the rules of *Mt. Healthy* and *Swingline* to show that defendants ignored the permanent injunction in violation of plaintiffs' First Amendment rights, they must first demonstrate that a *specific court order* was violated.[10]

 One provision of the injunctive order which defendants have allegedly violated states:

Defendants are permanently enjoined from disciplining, demoting or dismissing Ira Vanterpool or Elizabeth Fujiwara from his or her present position solely or in substantial part by reason of any of the statements attributed to either of them in the letters recommending discharge written by Mr. Yamashita and the letters discharging them written by Mr. Clark.

Plaintiffs argue that this provision was violated when defendants revised their job descriptions to insure closer supervision of plaintiffs.

A comparison of plaintiffs' original and revised job descriptions reveals that plaintiffs' employment duties were not substantially modified.[11] Plaintiffs retained their major job responsibilities: to provide technical assistance and advice to departmental personnel regarding the implementation of civil rights compliance programs, to investigate civil rights complaints, to conduct and coordinate civil rights orientation programs for departmental staff, to act as a liaison between the DOE and various state and community agencies concerned with civil rights, and to review DOE employment practices and educational programs to determine whether they are in compliance with the employment and educational opportunity laws. The only substantial modification in their job descriptions is the requirement that plaintiffs perform their duties upon assignment by the director.

 Plaintiffs also contend that plaintiff Vanterpool was demoted when defendant Clark replaced him as civil rights coordinator. Plaintiffs' first argument that defendant Clark's replacement of plaintiff Vanterpool on February 10, 1978 as civil rights coordinator lends little support to plaintiff Vanterpool's contention that he was demoted. This modification occurred prior to the issuance of the permanent injunction. After the order was issued, the DOE restored to plaintiff Vanterpool his prior employment responsibilities. I do not consider a change in an employee's job title as evi-

---

**9.** In *H. K. Porter,* the lower court incorporated a settlement agreement between the parties as its injunction order. In the Settlement Agreement, National Friction agreed to refrain from selling certain compounds to Frigidaire Division of General Motors, Inc., for use in the production of air condition pulleys, if they were based on Porter's formula for a molding compound supplied by Porter to Frigidaire. Subsequently, National Friction failed to comply with the provisions of the order. The Seventh Circuit, ruling that the court order had not been violated, stated:

the failure of an equity court to spell out in a decree's text the specific obligations resting upon the defeated litigant is *fatal to any contempt* proceeding unless we are to disregard the teachings of the masters of our law.

. . .

568 F.2d at 27 (emphasis supplied).

**10.** Rule 65(d) of the Federal Rules of Civil Procedure provides in part, "Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms . . . ."

**11.** *See* note 4 *supra.*

dence of demotion when his job responsibilities have not been substantially changed.

Plaintiffs' second argument that MACR Branch Procedure No. 11 granted substantial investigatory authority to defendant Yamashita as the DOE's new Civil Rights coordinator also fails to substantiate their contention that plaintiff Vanterpool was effectively demoted. Procedure No. 11 provides that investigations of civil rights complaints will be conducted by the Civil Rights Coordinator or *an assigned staff member.* Plaintiff Vanterpool's revised job description lists the investigation of civil rights complaints as one of his employment duties that are contingent upon assignment. Procedure No. 11 does not deprive him of this responsibility.

Plaintiffs have overlooked a provision in the order granting them injunctive relief which specifically states: "Nothing in this order shall be construed to . . . (2) prohibit Defendants from defining or redefining the Plaintiff's duties for nonpunitive reasons." Contrary to plaintiffs' allegations that defendants' actions constituted a demotion, I find that these actions clearly fall within this provision of the injunctive order.

Plaintiffs also claim that defendants' actions and the policies of the DOE assured them of their right to continued employment. They argue that this right was abrogated in violation of the injunctive order because of defendants' irritation with plaintiffs for their public criticism of DOE policy. Plaintiffs overlook, however, that the injunctive order that restored plaintiffs to their former positions of employment did not direct defendants to rehire plaintiffs upon the expiration of their term of employment. On the contrary, the order specifically stated, "Nothing contained in this order shall be construed to . . . (3) grant plaintiffs any greater right to continued employment than they would have without regard to the attempted discharge which is hereby enjoined." Therefore,

plaintiffs' motion for contempt, premised upon their claim that their right to continued employment was violated, can be maintained only if this Court first determines that plaintiffs had a right to continued employment.

Plaintiffs assume that they have a right to continued employment. They contend that a provision in the DOE's Notification of Personnel Action form provided that plaintiffs' continued employment was contingent solely upon the availability of funds. This contention is without merit.

To support existing state civil rights compliance programs, Congress appropriated federal funds under Title IV to provide temporary technical assistance to these programs. All employment positions authorized under a federal contract pursuant to Part 180 of Title 45 of the Code of Federal Regulations are temporary positions which are limited in duration to one fiscal year beginning on July 1 and ending on June 30. Section 180.13 of the Federal Register, Vol. 39, No. 92, provides in part, "(a) An applicant desiring to enter into an arrangement pursuant to this subpart *for any fiscal year* shall submit to the Commissioner a proposal for such fiscal year . . .." Section 180.13 clearly indicates that plaintiffs' temporary positions were contingent upon the availability of federal funds under a particular contract, specifically Federal Contract # C309–77–0004.

Plaintiffs' employment was also contingent upon the USOE's acceptance of the DOE's annual application for funds. Section 100a.27, Federal Register, Vol. 38, No. 213, which is applicable to contracts under Title IV of the Civil Rights Act of 1964, states: "(a) on the basis of the review of an application . . . the [USOE] will either (1) select the application for funding either in whole or in part, . . . (2) not select the application for funding, or (3) defer action on the application for such reasons as lack of funds or a need for further review."

When plaintiffs applied for their positions of employment, it was clear that they were applying for temporary positions for a limited term of 12 months. The job vacancy announcement which described their positions stated, "Appointment will be on a temporary basis with no probationary service credit (no tenure or guarantee of reemployment). This position is on a 12 month basis with vacation and sick leave as provided other professional employees of the Department of Education.[12] Rules 1 and 2 of the budget manual of the DOE define a temporary position as "[a] position which is established for a specified period." In contrast, a permanent position "is expected to last continuously in the Department's authorized position count." [13] Because plaintiffs were aware of the temporary nature of their positions, they have no right to continued employment beyond the expiration date of their one-year contract. *Halpin v. Reile*, 64 Misc.2d 1023, 316 N.Y. S.2d 819 (Sup.Ct.1970).[14]

Based on their assumption that they are entitled to continued employment, plaintiffs contend that defendants purposely revised the 1978–79 grant application to eliminate plaintiffs' positions; that the DOE's need for an enlarged technical staff was reflected in its original 1978–79 application which was intentionally destroyed to insure that the revised application would be viewed as an accurate reflection of the DOE's program needs; that a new revised proposal was unnecessary because the final regulations of the USOE did not differ substantially from the proposed regulations under which defendants submitted their initial 1978–79 application; and that the DOE refused the USOE's offer to extend the grant through September 1978 in order to terminate plaintiffs' employment. Furthermore, plaintiffs argue that defendants caused the premature demise of the DOE's 1977–78 civil rights compliance effort by falsely representing to the USOE the accomplishment of tasks scheduled for completion by the end of the fiscal year. Several objectives, enumerated by defendant Yamashita in his 1978–79 grant application, coincide with those proposed in the 1977–78 application and those summarized by Mr. John Palomino, in his letter of July 2, 1978. This overlap, plaintiffs argue, indicates that the tasks which defendant Yamashita had represented as complete in his closing report to the USOE of January 15, 1978 and those goals which the DOE had agreed to accomplish pursuant to Mr. Palomino's letter remained unfulfilled.[15] In addition, there remained an ongoing demand for a liaison between the DOE officials and state and community organizations concerned with civil rights. With unaccomplished project goals and other needs of a continuing nature, plaintiffs contend that the proposed

12. Vacancy Announcement, December 6, 1976 and February 13, 1977. *See* Defendants' Memorandum, *supra* note 2, at Exhibits G and H.

13. *See* Defendants' Memorandum, *supra* note 2, at 48.

14. In *Halpin*, a patrolman was fired from his temporary position with the police department of the Village of Herkimer. Prior to his employment, a Certificate of Eligibles List was forwarded to the Mayor of the Village which set forth the details of plaintiff's interview with the department and provided that plaintiff was eligible for a temporary term of employment of six months. The New York trial court determined that the temporary nature of the patrolman's employment did not grant him a right to continued employment. The Court stated: "If the petitioner indicates a willingness to accept a temporary employment and written notice of his selection so indicates, as it does here, then the petitioner is fully advised of the temporary nature of his appointment and such does not ripen into permanent employment." 64 Misc.2d at 1025, 316 N.Y.S.2d at 823; *see Roberts v. Parker*, 52 A.D.2d 651, 381 N.Y.S.2d 556 (1976).

15. These tasks included *inter alia* the promulgation of grievance procedures for students and DOE employees, the training of state and district civil rights coordinators in monitoring educational and employment programs for compliance with sex discrimination and national origin discrimination laws, the development of a computerized data system for civil rights monitoring, the completion of a survey to determine the expenditures of each athletic department by sport and sex, and the promulgation of Title IX Guidelines to be distributed to each school.

smaller decentralized program was inadequate to meet the objectives of the Civil Rights Compliance effort and that the DOE could not reasonably rely upon one highly placed aide to the Superintendent to accomplish these goals.

These contentions by plaintiffs are unpersuasive. Not only does Section 180 of Title 45 reflect the limited nature of employment of a "technical assistant," it also clearly indicates that it is within the discretion of the educational agency to determine its need for technical assistance. Section 180.-11, Federal Register, Vol. 40, No. 115, specifically states:

(a) Any state education agency may submit a proposal for a contract . . . for the purpose of rendering technical assistance, upon request, to any school board, municipality, school district, or other governmental unit legally responsible for operating a public school or schools in the preparation, adoption, and implementation of plans, assurances, or programs for the desegregation of public schools. A proposal may focus only on desegregation on the basis of race, color, religion, or national origin, only on desegregation on the basis of sex, or on both of these types of segregation.

(b) Technical assistance proposed to be rendered pursuant to this subpart shall consist of or include the provision of information regarding effective methods of coping with special education problems occasioned by desegregation.

Thus, the issuance of a grant contract by the USOE is predicated upon the agency's voluntary submission of an application to the USOE.

Under the Tenth Amendment, a state is not obliged to contract with the Federal Government. *Massachusetts v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923).[16] *Mellon* indicates that it is within the discretion of the state to seek the federal assistance it believes is necessary to carry out its programs. Presumably, its needs may change over the course of the fiscal year. Defendant Yamashita was free to submit a revised 1978–79 grant application based upon the DOE's determination to eliminate outside technical assistance and decentralize the civil rights compliance program. Furthermore, defendants acted within their proper discretion in rejecting the USOE's offer to extend the 1977–78 grant through September 30, 1978. It is therefore irrelevant that defendant Yamashita included program objectives in his application for 1978–79 that should have been accomplished in the prior year, or that the original 1978–79 application, based on proposed USOE regulations, differed substantially from the revised application under the final regulations.

Plaintiffs have failed to show by clear and convincing evidence that an express provision of the injunctive order has been violated by defendants. Therefore, IT IS HEREBY ORDERED that plaintiffs' motion for order citing defendants for contempt of court is DENIED.

16. In *Mellon,* a state and a taxpayer challenged the constitutionality of the federal Maternity Act, which provided financial assistance to the states to combat maternal and infant mortality. A provision in the Act permitted the Federal Government to withhold payments if funds were not properly expended by the state. *Mellon* was decided on other grounds; however, the Supreme Court indicated, in dictum, that this provision did not violate the Tenth Amendment. The Court stated, "Probably it would be sufficient to point out that the powers of the state are not invaded, since the statute imposes no obligation but simply extends an option which the state is free to accept or reject." 262 U.S. at 480, 43 S.Ct. at 598.